Joe CARRABBA, Jr., et al., Plaintiffs,

v.

**RANDALLS FOOD MARKETS, INC., Defendant.**

**No. 4:96CV651A.**

United States District Court,
N.D. Texas,
Fort Worth Division.

April 11, 2000.

Order Revising and Supplementing Opinion April 26, 2000.

Robert Lee Wright, Gardere Wynne Sewell, Dallas, TX, Thomas Francis Dunn, Dunn & Roark, Arlington, TX, for Joe Carrabba, Jr., Joe Melton, Craig McKnight, Robert H. Burrows, Jr.

Robert Lee Wright, Gardere Wynne Sewell, Dallas, TX, for Barbara A Williams, Loyd Wellesley, Williard P. Correll, Sr., Bruce Philpot, J. Bruce Gray, Rick Williams, A. Joe Cutrer, Roberto G. Fernandez Vinas, Thomas D. McCarthy, Wylie Holmes, Dave Cooper, Ed Fortner, Jack D. Neal, Floyd E. Fulcher, Gregory E. Smith, Michael Chessmore, Ima Dell Irvin.

Elaine A Murphy, Gardere Wynne Sewell, Dallas, TX, for Jack W Sprabary, Robert L. Stockton, Carroll E. Brown, Michael J. Hammer, Scott E. Peterson, William H. Mansfield, Jr., James S. Standifer, Bettie J. Garrett, Cherie J. Stowe, Arvil R. Martin, Jr., Sanford W. Maynard, Denise P. Miller, Everett G. Grosgebauer.

George Walter Bramblett, Jr, Haynes & Boone, Dallas, TX, Thomas Joseph Williams, Haynes & Boone, Fort Worth, TX, David Tarleton Harvin, Wallis Mizell Hampton, Vinson & Elkins, Houston, TX, for Randalls Food Markets Inc, defendant.

## MEMORANDUM OPINION
### and ORDER

McBRYDE, District Judge.

The background of this litigation and its history through mid-February 1999 are set forth in the memorandum opinion the court signed February 18, 1999, *Carrabba v. Randalls Food Markets, Inc.,* 38 F.Supp.2d 468 (N.D.Tex.1999), the contents of which are adopted by reference. Since mid-February 1999, the court has held proceedings to the end of resolving the remaining issues. A bench trial on

those issues was conducted November 22, 1999.

## A.

### *The Remaining Issues to be Decided*

A conclusion that follows from the court's decision that the MSP did not qualify as a "top hat" plan is that the members of the Class did not receive the financial benefits they should and would have received upon termination of the plan in 1992 if the plan sponsor had recognized that the MSP was subject to the accrual and vesting requirements of ERISA and had acted accordingly. By order signed July 13, 1999, the court certified for handling on a Class basis all issues that remained to be resolved in this action. The Class continued to be as previously defined. *See Carrabba*, 38 F.Supp.2d at 470. The court's task now is to fashion appropriate equitable relief, *see* 29 U.S.C. § 1132(a)(3)(B), for the Class to provide them financial benefits that will recognize the requirements of ERISA.

The parties are in serious disagreement over the nature and level of the benefits the court should afford the Class by way of equitable relief. Plaintiffs argue that the court should match the financial generosity they say the plan sponsor showed the plan participants over the years by providing equitable relief on the basis of a formula and calculation techniques that would produce a financial result they contend recognizes that generosity. And, plaintiffs maintain that, because of having kept and used in its business money that they say should have been paid to the participants, defendant should be required to share with the Class its business profits. In contrast, defendant maintains that the equitable relief should not extend beyond the difference between the financial benefits the Class would have received upon termination of the plan if the employer had complied with the minimum obligations ERISA imposed on the employer with respect to the plan and the payments the Class members actually received when the plan was terminated. Apparently, defendant concedes that it should pay prejudgment interest on that difference.

If the court were to adopt the approach urged by the Class, their award against defendant would be in excess of $100,000,000. In contrast, defendant is urging the use of a formula and calculation techniques that would produce for the Class an award of around $5,000,000 plus prejudgment interest. Each side's version of equity is sponsored by a seemingly well-qualified expert witness, Craig Dale Rogers ("Rogers") for the plaintiffs and Joe Huffman ("Huffman") for the defendant, each of whom maintains with apparent sincerity that a proper application of ERISA to the facts of this case supports the version of equity advanced by the side that employed him.

The starting point in the calculations of each side is the projected retirement benefits, as specified in agreements made between the plan sponsor and the participants, to be received by the respective participants upon retirement from the plan sponsor's employment at age 65. But the calculations of the parties have little in common beyond that starting point. Each expert witness presented alternative sets of calculations, with a preferred set as to each. Rogers's preferred set is under tab G of Agreed Exhibit 138. Huffman's is under tab A of Agreed Exhibit 139.

The preferred calculations of Rogers show an underpayment to the participants upon plan termination of $42,550,941. According to Huffman's preferred calculations, the underpayment was $4,802,863. This large discrepancy is attributable primarily to the following differences in calcu-

lation techniques, factors, and assumptions used by the experts:

1. Rogers used in his calculations a straight-line, current compensation accrual method, and the benefits were accrued over years of service with the plan sponsor rather than years of participation in the plan.[1] In contrast, Huffman used a career average accrual method, with the accrual calculated on the basis of years of participation in the MSP rather than years of employment with the plan sponsor.[2]

2. Rogers assumed in his calculations that all participants, regardless of years of participation in the plan, became 100% vested in their accrued benefits when the plan was terminated. Huffman used a five-year cliff vesting (as contemplated by 29 U.S.C. § 1053(a)(2)(A)) assumption in his calculations.[3]

3. Rogers assumed in most of his sets of calculations full accrual by age fifty-five.[4] Huffman used in his calculations a retirement age of sixty-five.

4. Rogers used the applicable Pension Guarantee Benefit Corporation ("PBGC") rate in his present value calculations, whereas Huffman used 120% of the PBGC rate in all instances where the present value exceeded $25,000.

5. Rogers did not use a mortality factor (which would take into account the possibility that a participant would die prior to retirement date) in his calculations of present value. Huffman did.

6. Rogers used a plan termination date of August 24, 1994,[5] (which is the earliest date when defendant could have terminated the plan if it had honored a contractual commitment it made to the initial plan sponsor) in his preferred calculations rather than to use the actual date of termination of December 31, 1992. Huffman used in his preferred calculations the actual date of termination.[6]

In addition to the calculation disputes, the following issues must be resolved:

1. (a) the rate to be used in the calculation of prejudgment interest (interest calculated from the actual or assumed date of termination of the MSP through the date of entry of judgment) on the underpayment amounts the court determines the members of the Class should receive from defendant, and (b) whether the interest should be compounded;[7]

---

1. Rogers performed alternative calculations that assumed as to each participant that the full benefits the participant was to receive under the MSP upon retirement were accrued on the date the plan terminated, without regard to the participant's tenure of employment or years of participation in the plan.

2. Huffman performed alternative calculations using the straight-line accrual method.

3. Huffman performed alternative calculations based on the assumption that all participants were 100% vested on the date of termination of the plan.

4. In some of Rogers' calculations he assumed full accrual by age fifty-five, but that payment of retirement benefits would not start until age sixty-five. In his preferred calculations, Rogers assumed full accrual by age fifty-five,

and that the retirement payments would commence at that age.

5. Rogers presented an alternative preferred calculation, under tab H of Agreed Exhibit 138, in which a December 31, 1992, termination date was used. That calculation produced a $34,767,517 underpayment number.

6. Huffman performed an alternative set of preferred calculations using an August 24, 1994, termination date, which produced an underpayment number of $6,637,556.

7. Defendant seems to concede that there should be an award of prejudgment interest, but disputes the rate urged on behalf of the Class and the contention of the Class that there should be compounding.

2. the effect, if any, on the claims at issue of release documents certain members of the Class executed and delivered to defendant upon termination of employment;

3. whether the members of the Class should be awarded a share of the profits defendant made from its use of funds that would have been paid to the Class if defendant had properly determined vested accrued benefits and paid them at the time the plan was terminated;

4. whether the employees who would have been properly included as participants in a "top hat" plan should, for that reason, be denied recovery of additional termination benefits;[8] and

5. the amounts, if any, to be awarded the Class against defendant as attorneys' fees and other litigation expenses.[9]

### B.

### *The Plan Document and Related Plan Agreements*

Because the MSP was intended to be a top hat plan exempt from ERISA requirements, it was not drawn as a plan in compliance with ERISA. The MSP lacked the vesting and accrual provisions mandated by ERISA. *See* 29 U.S.C. §§ 1053(a) and 1054(a) and (b). There was no provision for accrual or vesting prior to a participant's actual retirement of any of the financial contributions the MSP contemplated the employer would make to the projected retirement benefits.

The normal retirement benefits provided by the MSP, and some of the conditions to receipt of those benefits, were specified by the plan document as follows:

4.1 *Normal Retirement.* If a Participant has remained an Employee until age sixty-five (65) and shall then Retire, and if this Program and his Plan Agreement have been kept in force, the Company will pay or cause to be paid to such Participant as a Retirement Benefit (herein so called), the amount per month specified in his Plan Agreement, commencing on the first day of the month following such Participant's retirement, or as otherwise specified in his Plan Agreement.

Agreed Ex. 3 at IV–1. The words "Retirement" and "Retire," as used in the plan, were defined by the plan to mean "severance of employment with the Company at or after the attainment of age sixty-five (65)." *Id.* at I–2.

By separate plan agreements, which were annexes (Annex I's) to the MSP, the projected retirement benefits commencing at age 65 for the respective plan participants were specified. An example of the standard language defining the amount of the retirement benefits (except for differences in the dollar amount) used in these agreements is as follows:

3. Retirement Benefit:

(a) Retirement at age *65 —$ 148,200*

This amount to be paid in 120 equal monthly installments (or as otherwise mutually agreed by the Participant and the Committee) following age *65* or following retirement, as determined by the Committee.

---

8. Plaintiffs contend that all participants should share in the recovery. Defendant maintains that equity compels exclusion of the participants who could have been in a top hat plan.

9. The court and the parties have proceeded on the basis that the procedural requirements of Federal Rule of Civil Procedure 54(d)(2) have been satisfied as to the claim by plaintiffs for recovery of attorneys' fees from defendant under 29 U.S.C. § 1132(g)(1).

Agreed Ex. 3, Annex I at first and second pages. Each plan agreement went on to specify the dollar amount to be deducted from the participant's compensation each month as the contributions of the participant, by way of compensation deferrals, to the cost of the retirement benefit. *Id.* at second page. Thus, payment of the compensation deferrals by a participant was a further condition to receipt of the retirement benefits of the MSP.

The plan document expressly gave the employer "the right to terminate … [the plan] at any time," Agreed Ex. 3 at X-1, except as to any participant who was in pay status under the plan by reason of retirement, *id.*[10] According to the plan document, termination of the plan caused the employer to have no further obligation under the MSP. *Id.* A participant's right to receive a retirement benefit under the plan was said by the plan document to "be forfeitable at all times prior to the date that he first satisfies the requirements for Retirement hereunder." *Id.* at IV-2. Specifically, the plan said that "no portion of a Participant's Retirement Benefit shall accrue to him prior to the date that he first satisfies the requirements for Retirement hereunder." *Id.*

An early retirement benefit, "in an actuarially reduced amount," was described in the plan document, but the determination of the amount as to a particular participant was left to the "sole and absolute discretion" of the retirement plan committee. Agreed Ex. 3 at IV-1. A later document provided by the employer to the plan participants established a formula for determination of early retirement benefits. Pls.' Ex. 6 at 2. The benefits were to be a percentage of the normal retirement benefit, determined by age at retirement and years of service. *Id.*

As the court has previously ruled, the MSP was an unfunded retirement plan. 6/5/98 Mem.Op. & Order; 9/9/98 Order. Retirement benefits were to be paid from the general assets of the employer. Agreed Ex. 3 at VII-1.

The annexes provide with respect to the employer's financial obligations upon termination of the MSP that:

> Upon any termination of the Plan, the Company, after payment of all involuntary termination benefits, may in its absolute discretion pay any additional benefits the Committee may determine.

Agreed Ex. 3, Annex I at third page. The paragraph of the annex that immediately precedes the language that is quoted above makes clear that the term "involuntary termination benefits" has reference to "an amount equivalent to all of [the participant's] deferrals to the Plan." *Id.* Thus, prior to a participant's retirement pursuant to the terms of the plan, the only accrued or vested interest a participant had under the plan was in his or her deferred compensation contributions.

## C.

### *Representations Made by the Plan Sponsor–Employer*

█ Plaintiffs maintain that written and verbal representations made by the employer to the plan participants from time to time were the equivalent of amendments to the plan document and plan

---

**10.** The annexes also addressed plan termination, saying:

> [T]he Plan and this Plan Agreement may be terminated at any time, in the sole discretion of the Company, without any obligation of any nature whatsoever to the Company, except a Participant shall have those rights provided for the extent such may be applicable to him at the time of such termination.

Agreed Ex. 3, Annex I at third page.

agreements. However, the court cannot find that any representation was made by the employer to the participants that would justify a reasonable belief by the participants that, in any respect relevant to the issues presented here, their rights under the MSP were greater than, or different from, the rights and obligations described in the plan document and the plan agreements, as set forth above.

## D.

### *The Payments That Were Made Upon Termination of the MSP*

If the terms of the MSP and related documents had been followed, the only payment defendant would have been obligated to make to any non-retired participant upon termination of the plan would be the total amount of his or her deferred contribution payments. However, the official of defendant, Bobby Louis Gowens, ("Gowens") who calculated the amounts to be paid to the participants when the plan was terminated disregarded the employer's payment obligations under the plan and related documents, and arbitrarily arrived at a formula for determining the amounts to be paid. His formula gave all participants some credit for the number of years of service he or she had, and took into account the total amount of the contributions of the participants by way of compensation deferrals.

Gowens said that his calculations were not based on what the MSP plan documents said, but simply were what he thought the "people ought to receive." [11] Narrative Summary of Deposition Testimony of Bobby Gowens at 3. Many, if not most, of the payments he caused to be made were more than the MSP required.

The underpayments calculated by the expert witnesses are the amounts they, respectively, concluded the participants should have received over and above the payments made pursuant to the calculations of Gowens for, in the respective views of the expert witnesses, the requirements of ERISA to be properly recognized.

## E.

### *The Relief to be Granted by the Court is Equitable Relief—Not a Recovery Under the Plan*

■ Plaintiffs maintain that they are entitled to recover under the authority of 29 U.S.C. § 1132(a)(1)(B) benefits due them under the terms of the MSP. If recovery under the terms of the MSP were the nature of plaintiffs' action, they would recover very little because there is no evidence that upon termination of the MSP they did not receive basically everything to which they were entitled under the provisions of the MSP. The remedy of the Class lies instead in the grant of appropriate equitable relief, as contemplated by 29 U.S.C. § 1132(a)(3)(B), to address violations of, and to give effect to, the accrual and vesting provisions of ERISA. In deciding the equitable relief to be granted, the court is taking into account all the facts and circumstances described in *Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468 (N.D.Tex.1999), as well as all the evidence received during the course of both trial proceedings conducted in this case.

The court has concluded that equity would be served in this case if the members of the Class were to be placed in basically the same financial position in

---

**11.** The discretionary calculations were, in fact, consistent with the authority the plan sponsor had to pay to participants upon ter- mination of the plan "any additional benefits" it, in its "absolute discretion," might choose to pay. Agreed Ex. 3, Annex I at third page.

which they would be if the employer had complied with the minimum requirements necessary for the MSP to satisfy the accrual and vesting provisions of ERISA[12] and if the underpayments made to the Class were to be determined on an assumed August 24, 1994, date for termination of the MSP (bearing in mind the contractual commitment of defendant not to terminate the plan prior to that date).

## F.

### Defendant Has Not Established That Any Member of the Class Released His or Her Claim

■ In return for a severance payment based on years of service and accrued vacation time, some participants, when terminating employment with defendant after the MSP was terminated, signed a document releasing and discharging defendant "from all claims, liabilities, demands and causes of action, known or unknown, fixed or contingent, which [they might] have or claim to have against [defendant] as a result of [their] employment and this termination." *E.g.*, Agreed Ex. 110 at first page. An affirmative defense asserted by defendant against those participants is that the documents they signed released defendant from liability as to the claims being asserted in this action.

■ The validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims. *Sharkey v. Ultramar Energy, Ltd.*, 70 F.3d 226, 231 (2d Cir.1995).

Courts scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful relinquishment of an employee's rights. *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 181 (1st Cir.1995). In other words, a "knowing and voluntary" test is applied. *Sharkey*, 70 F.3d at 231. The burden is on the defendant to show that a plaintiff intentionally relinquished or abandoned a known right or privilege. *Smart*, 70 F.3d at 181–82.

In this case, the court cannot find that defendant has met its burden as to any of the plaintiffs. In particular, there is no evidence that any of the plaintiffs understood that they were releasing claims relating to the MSP, which had been terminated on December 31, 1992, long before the execution of any of the releases. The facts of this case are thus distinguishable from those in the cases cited by defendant. *See, e.g., Morais v. Central Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d 709 (1st Cir.1999) (settlement of suit on improper calculation of disability pension barred second such suit); *Wittorf v. Shell Oil Co.*, 37 F.3d 1151 (5th Cir.1994) (plaintiff who specifically threatened to revoke release of ERISA claims but failed to timely take action could not later sue on those claims); *Mange v. Petrolite Corp.*, 960 F.Supp. 206 (E.D.Mo.1997), *aff'd*, 135 F.3d 570 (8th Cir. 1998) (signers who knew company position about vacation pay could not claim release did not affect vacation pay rights).

**12.** The court recognizes that in certain instances over the years the employer provided benefits to the plan participants that exceeded the employer's obligations under the MSP, and, that the retirement benefits, when earned under the MSP, were often generous. However, the court cannot find that there was a pattern of conduct that would justify a conclusion that equity would be served by awards in excess of those the court is granting. With exceptions that are not material to the conclusions expressed in this opinion, the MSP was administered in accordance with its provisions over the years of its operation. As a rule, before the plan was terminated, the persons whose participation in the MSP ended prior to their retirement received only the return of their deferrals.

The indication from the evidence is that neither party to the waiver/release documents gave any thought to the MSP or any claims arising under the MSP when the documents were drawn, signed, and delivered. There is certainly no basis in the evidence for any finding that any signatory on such a release/waiver .document intended by execution and delivery of the document to release defendant of any claim that is being asserted in this action.

## G.

### *Eligibility to Participate in a "Top Hat" Plan Is Not An Equitable Reason for Denial of Recovery*

■ The court is not persuaded that equity compels exclusion from recovery in this action of those participants in the MSP who could have properly been included as participants in a top hat plan. Consistent with the principle underlying ERISA that, as a general proposition, an employer should provide uniform treatment to participants in a retirement plan, *Frontier Airlines, Inc. v. Frontier Airlines, Inc., Pilot's Pension Board (In re Frontier Airlines, Inc.)*, 84 B.R. 724, 729 (Bkrtcy.D.Colo.1988), the court has concluded that all participants in the MSP should be given uniform treatment in the calculations of the awards to be made to the participants against defendant and the granting of those awards.

## H.

### *"Profits" Made by Defendant Are Not to Be Included in the Awards*

■ The court has concluded that equity does not compel an award to the members of the Class against defendant of any amount that would represent profits made by defendant from its use of funds that it would have paid to the Class if it had honored ERISA's accrual and vesting re-quirements at the time the plan was terminated. The factors the court considered in determining the relief to be granted plaintiffs against defendant are sufficient to satisfy the demands of equity. There is no need, from an equitable standpoint, to include in each of the awards a speculative number based on the notion that defendant's business ventures would not have been as profitable after the date the plan was terminated if defendant had recognized that the MSP was not a top hat plan and had made termination distributions to the participants on a basis that took into account the requirements of ERISA.

## I.

### *Equitable Resolutions of the Calculation Disputes of the Experts*

■ The approach of plaintiffs and their expert to the calculations of the awards to be made to the plaintiffs misinterprets, for the most part, the goals of ERISA. After having related the facts that led to the passage of ERISA, Congress concluded the first paragraph of its findings and declarations of policy with the following words:

> [I]t is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, *that minimum standards be provided assuring the equitable character of such plans* and their financial soundness.

29 U.S.C. § 1001(a) (emphasis added). And, in the final paragraph of its findings and declaration of policy, Congress explained that the policy of ERISA was "to protect ... the interest of participants in private pension plans ... *by improving the equitable character* and the soundness of such plans by requiring them to vest the accrued benefits of employees with signifi-

cant periods of service . . . ." *Id.* § 1001(c) (emphasis added). The court concludes that, generally speaking, giving the participants the benefit of the "minimum standards" of ERISA would satisfy the policy behind ERISA by "assuring the equitable character" of the MSP. *Id.* § 1001(a).

Once the equitable character of the MSP has been assured by calculations that define the payments that would be required to satisfy the minimum standards of ERISA, there will have been a great stride toward the objective of fashioning the appropriate equitable relief the court is empowered to grant by 29 U.S.C. § 1132(a)(3)(B). Thus, with exceptions to be noted, the court has concluded that the minimum standards of ERISA should be recognized, and given effect, in the calculations. The court's task in that regard is simplified to a degree by the concession of Rogers that if his "mission statement was . . . to calculate only benefits that would not be forfeitable under ERISA," he would have done the same thing Huffman did in his calculations. 11/22/99 Tr. at 111. Rogers, in effect, admitted that the products of Huffman's calculations are the amounts that defendant would have been obligated to pay to the participants upon termination of the plan if the MSP had satisfied the minimum standards of ERISA. *Id.* at 109–11.

### 1. *The Accrual Methods that Should be Used In the Calculations.*

As a defined benefit plan, the MSP should have satisfied one of the three accrual schedules set forth in 29 U.S.C. § 1054(b)(1). Plaintiffs' expert witness, Rogers, proposes for use in the damage calculations a straight-line, current compensation accrual method of the kind contemplated by 29 U.S.C. § 1054(b)(1)(C), while defendant's expert witness, Huffman, advocates use of a career average accrual method that satisfies the requirements of 29 U.S.C. § 1054(b)(1)(B). Each expert said his selection was based on his assessment of the method that most closely resembles the progression of MSP benefits he observed in the actual operation of the MSP over the years.

Due to the absence of an accrual method in the plan, the court is called upon to select for use in the calculations of the awards to be made to the participants against defendant one that, in equity, most appropriately recognizes the objectives of the MSP in an ERISA context. The court finds that the accrual method advocated by Huffman is the one that should be used for that purpose. That Huffman's method of accrual is not expressed in the MSP and was never used during the operation of the MSP is neither surprising nor relevant. Because the employer thought the MSP was not subject to ERISA accrual requirements, the plan contained no accrual method, and there was never an occasion under the terms of the plan to calculate an accrual (except to the extent that deferred compensation payment calculations for a terminating employee might be viewed to be such).

### 2. *Years of Participation in the Plan Rather Than Years of Service Should be Used in the Calculations.*

The court fails to perceive the logic in the use by Rogers of years of service with the employer rather than years of participation in the plan in his calculations. On the other hand, Huffman's use of years of participation in the plan in his calculations makes sense in the light of the language of the MSP.

The MSP provided that as a condition to participation in the plan, and receipt of benefits under the plan, an employee had to make contributions by way of compensation deferrals. Such contributions were

made only during the employee's participation in the plan, not during the years of employment prior to plan participation. Under the terms of the plan, a "Participant" was "an Employee who is selected and elects to participate in the Program through the execution of a Plan Agreement...." Agreed Ex. 3 at I–2.

There is nothing in the MSP plan document or the related agreements to suggest that years of employment was a factor in determining benefits to be received under the MSP, while, as noted, there is indication that years of participation in the plan was a factor. The court has concluded that Huffman correctly used years of participation in the plan in his calculations.

### 3. The Normal Retirement Age of Sixty–Five Should be Used in the Calculations.

No plausible rationale was provided by Rogers for his use of the early retirement age of fifty-five for all participants in his calculations. The court has concluded that early retirement benefits are not required to be taken into account in determining accrued benefits under ERISA, and that Huffman correctly used the normal retirement age of sixty-five in his calculations.

### 4. The Methods Used By Huffman to Determine Present Value Are Proper.

The court is satisfied that if the plan sponsor had realized that the MSP did not qualify as a top hat plan, and, therefore, had complied with the vesting and accrual standards of ERISA, the retirement plan would have included provisions authorizing use of the discount techniques employed by Huffman to determine present values. The MSP reflects an intent to minimize the obligations of the employer upon termination of the plan. Therefore, the court considers it appropriate, when converting the plan sponsor's obligations to ERISA-based termination obligations, to apply the minimum standards for determining present value that could have been adopted by the employer. Equity will have been served in this case by the use of 120% of the PBGC rate in the present value calculations in all instances where the present value exceeds $25,000, and by the use of a mortality factor in the making of those calculations.

### 5. The 100% Vesting Assumption Should be Used.

The court finds that the five-year cliff vesting formula used by Huffman is acceptable under ERISA, and that it was a formula commonly used by employers. However, the court finds that the most equitable approach to vesting would be to consider that all participants became 100% vested at the time of plan termination. Such a 100% vesting would have been required if the MSP had been a tax-qualified plan. For this purpose, the court assumes that the employer would have caused the plan to be tax-qualified if the employer had been aware that the plan was subject to the accrual and vesting standards of ERISA.

### 6. A Plan Termination Date of August 24, 1994, Should Be Used.

The parties are in agreement that if defendant had honored an agreement it made with the initial plan sponsor at the time defendant purchased the sponsor, the defendant would not have terminated the plan before August 24, 1994. Without reaching the issue of whether the participants in the plan were beneficiaries of some nature of defendant's contractual commitment, the court has concluded that it would be inequitable for the plan participants to be totally denied relief from the

consequences adverse to them of such a premature termination of the plan.[13]

Therefore, the court, in fashioning appropriate equitable relief for the Class, is going to be guided by the calculations of Huffman that are identical to his preferred calculations except for the changes required to convert to 100% vesting and the changes he was required to make to convert from a December 31, 1992, termination date to an August 24, 1994, termination date. The applicable set of calculations is the alternative set that is under Tab L of Agreed Exhibit 139. Those calculations show that the total amount of the underpayments to the Class is $6,745,409, determined as of August 24, 1994. In making those calculations, Huffman properly took into account salary deferrals that would have been required on the part of the plan participants until August 24, 1994, and properly discontinued accruals from date of termination of employment of all participants whose employment terminated between December 31, 1992, and August 24, 1994. The final judgment to be entered in this action will have an allocation of the total amount of the underpayments to those members of the Class who experienced underpayments.

## J.

### Prejudgment Interest

■ Both sides recognize that prejudgment interest should be awarded in this case if there is an award of underpayments. Plaintiffs seek 10%, compounded annually; defendant argues that the Texas 6% contract rate, calculated as simple interest, should be used. The United States Court of Appeals for the Fifth Circuit says that "when awarding prejudgment interest

in an action brought under ERISA, it is appropriate for the district court to look to state law for guidance in determining the rate of interest." *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir.1991). However, "state law is not binding but merely provides guidance" and "it is within the discretion of the district court to select an equitable rate of prejudgment interest." *Id.*

■ Recently, the Texas Supreme Court has addressed the matter of prejudgment interest in cases like this one where the matter is not specifically addressed by statute. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex.1998). That court has held that, under common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *Id.* at 531. And, prejudgment interest accrues at the rate for post-judgment interest and is computed as simple interest. *Id.* at 532. Pursuant to TEX.FIN.CODE ANN. § 304.003(c) (Vernon Supp.2000), the post-judgment interest rate now applicable is 10% per annum, since the auction rate quoted on a discount basis for fifty-two-week Treasury bills issued by the United States government is less than 10%.

The parties make no arguments as to the date from which prejudgment interest should accrue. Plaintiffs could argue that the time runs from 180 days after March 12, 1993, the date demand was made by persons similarly situated to plaintiffs. *See* Pls.' Sixth Am. Original Compl., Ex. C. Defendant, on the other hand, could argue that the time should run from the date suit

---

**13.** In reaching the conclusion that August 24, 1994, should be used as the termination date, the court has taken note that Gowens, in making his calculations of the termination

benefits that were actually paid, recognized and took into account to a degree the fact that defendant had promised not to terminate the plan before August 24, 1994.

was filed, since plaintiffs themselves did not make written notice of a claim. The court has determined that August 25, 1994, the day after the assumed date of plan termination, should be the date that prejudgment interest begins to accrue.

According to calculations performed by the court, the total of the prejudgment interest chargeable in favor of the Class against defendant is $3,801,454.42 through the date of the signing of this order. The court anticipates that the final judgment to be entered in this action will show an allocation to each Class member who experienced an underpayment of his or her share of the prejudgment interest.

### K.

#### *The Appropriate Equitable Relief Being Granted to the Class*

The court has concluded that appropriate equitable relief for the Class, and the individual members thereof, will be provided by the award to the members of the Class against defendant of the underpayments in the total amount of $6,745,409 as set forth in the set of calculations under Tab L of Agreed Exhibit 139 plus prejudgment interest thereon consistent with this memorandum opinion. That relief will provide to the members of the Class essentially the same financial benefits they would have received if the plan sponsor had recognized, and given effect to, the accrual and vesting requirements of ERISA and had honored its contractual commitment to continue the MSP in effect until August 24, 1994.

### L.

#### *Attorneys' Fees and Other Litigation Expenses*

 ERISA provides that "[i]n any action under [ERISA] ... by a participant ... the court in its discretion may allow a

reasonable attorneys' fee and cost of action to either party." 29 U.S.C. § 1132(g). When considering whether a statutory fee award is appropriate, the court should consider the following factors: (a) the opposing party's degree of culpability or bad faith; (b) the opposing party's ability to satisfy an award of attorneys' fees; (c) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; (d) whether the party requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and, (e) the relative merit of the parties' positions. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir.1995); *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980). No one factor is determinative. *Bowen*, 624 F.2d at 1266.

Plaintiffs adduced evidence through the testimony of their lead counsel, Robert L. Wright, and exhibits (Agreed Exhibits 178 and 179) that through early November 1999 (slightly more than two weeks prior to the final trial session) plaintiffs had incurred attorneys' fees in the amount of $2,889,743.40 through lawyers with Mr. Wright's firm. Each side used at trial an independent attorney as an expert witness on attorneys' fees, Bill Bowers by the plaintiffs and Jim Barlow by the defendant. The indication from the testimony is that each of the attorney-experts thoroughly familiarized himself with this case and the work done by the firm with which Mr. Wright is associated.

Mr. Wright explained in his testimony the reasons why the lawyers with his firm devoted the time they did to the prosecution of this case, and why that work was necessary to pursuit of the claims being made in this action. He discussed applicability of the facts of this case to each of the

*Johnson*[14] factors. The only question posed to Mr. Wright on cross-examination was whether the value of Mr. Wright's time shown on one of the agreed exhibits was calculated by use of his firm's current hourly rate or by use of the hourly rates in effect as of the time the hours were worked, to which Mr. Wright responded that the hourly rates used were those in use when the case started.

Mr. Bowers testified that the fees incurred by plaintiffs through Mr. Wright's firm about which Mr. Wright had testified are reasonable in this area, and that the time expended by the attorneys was necessary under the circumstances. After having given consideration to the *Johnson* factors, Mr. Bowers expressed the opinion that an appropriate fee to be received by counsel for the plaintiffs would be twice what the fee charges would be at the normal hourly rates of the attorneys. The sole objective of the cross-examination of Mr. Bowers seems to have been to develop testimony that would persuade the court that Mr. Bowers was incorrect when he expressed the belief that the fees awarded to plaintiffs should be twice the amount derived from use of the normal per-hour rates charged by counsel for the plaintiffs. None of the cross-examination intimated that defendant took issue with the necessity for counsel of plaintiffs in the pursuit of the claims being asserted by plaintiffs in this action to do the work about which Mr. Wright testified his firm did or the reasonableness of the per-hour rates charged for that work.

Mr. Barlow's testimony was directed exclusively to the issue of whether defendants should be required to pay as attorneys' fees more than fees derived from an application of the normal per-hour rates of counsel for the plaintiffs to the time they devoted to the case, all as developed through the testimony of Mr. Wright. His opinion was that there should not be an adjustment up or down on the fees charged by counsel for the plaintiffs, as reflected by their billing statements that were received into evidence as exhibits. He made clear that the opinion he expressed was limited to the issue of whether there should be a recovery by plaintiffs from defendant of attorneys' fees above the lodestar amount and was not directed to the issue of whether counsel for the plaintiffs should be entitled, under the trust fund doctrine, to receive something above the lodestar from the Class members. Mr. Barlow said that he was not saying by his testimony that counsel for the plaintiffs are not entitled, based on the circumstances of this case, to recover more than their normal per-hour rates, only that the defendant ought not to be required to pay that excess. Defendant's expert did not question the necessity for the accomplishment of any of the work about which Mr. Wright testified, or the reasonableness of any of the charges made by the attorneys for any of that work.

In addition to giving testimony about services rendered by his firm, Mr. Wright identified during his testimony a list of disbursements made by his firm in the total amount of $373,491.93 and an exhibit (Agreed Exhibit 180) that showed time devoted by his co-counsel, Thomas F. Dunn, to work on the case, Mr. Dunn's charges for that time, and expenses incurred by Mr. Dunn's firm. There was no further evidence concerning the disbursements made by Mr. Wright's firm, the work done by Mr. Dunn, or the expenses incurred by Mr. Dunn's firm. No evidence was provided that any of those items were reasonable in amount or that any of the work, disbursements, or expenses were

14. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

necessary to the prosecution of the claims asserted on behalf of the Class in this action. There was no testimony that would enable the court to conclude that Mr. Dunn's work was not duplicative of the work done by the lawyers in Mr. Wright's firm. Throughout Agreed Exhibit 180 there are entries that Mr. Dunn reviewed documents that apparently were prepared by the other attorneys. There was no evidence that Mr. Dunn's review of those documents contributed at all to the pursuit of the claims asserted in this action. Consequently, the court cannot find from the evidence that there should be any recovery for the disbursements, Mr. Dunn's fees, or the expenses incurred by Mr. Dunn's firm. However, the court has concluded that the evidence supports a recovery by the Class of the attorneys' fees for work done by Mr. Wright and the lawyers with his firm, as reflected by Agreed Exhibits 178 and 179.

The only argument made by defendant in its post-trial brief against an award to plaintiffs from defendant of attorneys' fees based on normal per-hour rates applied to work actually done is that the court should take into account that plaintiffs are not the prevailing party in the damage phase of this lawsuit. Consequently, the court is not devoting attention to the other factors mentioned in *Todd* and *Bowen* other than to note that the court has considered all those factors and has concluded that, in balance, they support an award of attorneys' fees to plaintiffs from defendant. And, the court rejects the argument advanced by defendant in its post-trial brief that plaintiffs are not the prevailing party in the damage phase of this case. As plaintiffs point out in their reply brief, plaintiffs have been successful in many of the issues that have been presented to the court for resolution since conclusion of the liability phase of this case. Pls.' Reply to Def.'s Post–Trial Br. at 38–39.

While the court has not accepted all of the damage theories advanced by counsel for the plaintiffs in support of a larger award, the court is not prepared to say that any damage contention made on behalf of the plaintiffs has been frivolous or made in bad faith. The court is inclined to think that all such contentions were made in a good-faith belief on the part of counsel for the plaintiffs that they were obligated to make the contentions in order to adequately present plaintiffs' case to the court for resolution. The court concludes that plaintiffs were the prevailing party in the damage phase as well as the liability phase of this action.

The court finds that the attorneys' fees incurred through Mr. Wright's firm about which trial evidence was received were necessary to be incurred in the prosecution of plaintiffs' claims against defendant in this action and that all are reasonable in amount to be charged in this geographical area. Therefore, there being no basis in the evidence for a reduction below the lodestar amounts, an award is being made to plaintiffs against defendant for recovery of those fees.

However, the court has concluded that plaintiffs should not recover from defendant any enhancement over the lodestar amounts. Any recovery beyond that would tend to have a punitive effect on defendant. There has been no evidence of any conduct on the part of defendant that would cause the court to believe that defendant should be saddled with attorneys' fees or legal expenses incurred by plaintiffs beyond those that plaintiffs themselves would have paid if they had made timely payment at the usual per-hour rates charged by counsel for the plaintiffs. However, the court reserves for future decision the issue of whether, under the trust fund doctrine, counsel for the plain-

tiffs should recover some additional amount as attorneys' fees from the Class.

Mr. Wright gave testimony in support of an award to plaintiffs against defendant of attorneys' fees at the district court level beyond the last work reflected by Agreed Exhibits 178 and 179 and for attorney work anticipated in the event of an appeal to the Fifth Circuit and in the further event of an appeal to the United States Supreme Court, saying:

> [W]e anticipate that the amount of time spent trying the case, attending to post-trial matters, including motions and briefing and whatever the Court would desire there, together with the amount of time that we would spend in the event of an appeal to the Fifth Circuit, and a further appeal, if allowed to the United States Supreme Court, we're estimating that the total fees for all of that would be an additional $250,000.

Tr. of 11/22/99 trial at 135–36.

The court concludes that it should not make an award for anticipated legal expenses on appeal. If an appeal is taken, the Court of Appeals can deal with the issue of whether attorneys' fees should be awarded for time devoted to such an appeal, either by making the award itself or by directing this court to revisit that issue post-appeal.

In order to resolve the matter of possible recovery by plaintiffs for attorney time devoted to the representation of the Class through the district court beyond the attorney time shown on Agreed Exhibits 178 and 179, the court has signed two orders since the November 22, 1999, trial for the purpose of causing the record to be completed on that matter, one signed March 16, 2000, and the other signed March 24, 2000. The court is accepting as supplementations of the trial record the items submitted for filing by counsel for the Class pursuant to those orders.

In response to the March 16 order, counsel for the plaintiffs made a submission of updated legal expenses showing that (a) the charges for legal services rendered by Mr. Wright's firm from November 4, 1999, through March 13, 2000, are in the total amount of $325,086.50, (b) the additional disbursements through Mr. Wright's firm are in the total amount of $135,571.06, (c) the charges for services rendered by Mr. Dunn from November 11, 1999, through February 3, 2000, are in the total amount of $6,737.50, and (d) the additional expenses incurred by Mr. Dunn are in the total amount of $34.28.

Mr. Wright says in an affidavit submitted by counsel for the plaintiffs pursuant to the March 24, 2000, order that his clients do not seek recovery as attorneys' fees of the newly listed disbursements of $135,571.06. Inasmuch as there is no evidentiary basis for an award against defendant of any of those disbursements, the court is not allowing recovery of any of them. As no evidentiary basis was provided for an award of the additional fees and expenses incurred through co-counsel Dunn, the court is not making any award based on those fees and expenses.

However, even though the court has concluded that the submitted amount of additional attorneys' fees incurred through Mr. Wright's firm appears to be excessive, the court has concluded that there should be an award of what the court finds to be fees that are reasonable in amount for the additional services that were necessary to prosecute the claims of the plaintiffs. As a starting point, the court has broken down the additional fees incurred through Mr. Wright's firm into three time period categories, the first covering the November 4, 1999, through November 21, 1999, time period, the next covering the date of trial, November 22, 1999, and the third covering

the post-trial time period of November 23, 1999, through March 13, 2000. The attorneys' fees incurred by Mr. Wright's firm during the first time period are in the amount of $121,584.50 out of the $325,086.50 total. Mr. Wright's firm charged $9,982.50 for work devoted to this case on the date of trial. The remaining $193,519.50 out of the $325,086.50 total represents time counsel for plaintiffs say Mr. Wright's firm has devoted to this case since the November 22 trial.

Based on Mr. Wright's affidavit,[15] the court's knowledge of the history of this case and the work done by counsel in the case as reflected by the filings with and appearances before the court, the court's awareness of the legal fees normally charged in this area, and an independent evaluation by the court of the amount of time counsel for the plaintiffs reasonably should have devoted to representation of the Class post-Agreed Exhibits 178 and 179 and the fee charges that should be made for that time, the court makes the following findings and expresses the following conclusions relative to the work done by Mr. Wright's firm commencing on November 4, 1999, and going through March 13, 2000:

(a) the court finds that $121,584.50 is a reasonable charge to be made in this area for the work necessary to be done on behalf of the plaintiffs by way of trial preparation during the November 4, 1999, through November 21, 1999, time period;

(b) the court finds that $9,982.50 is a reasonable amount in this area for the attorneys with Mr. Wright's firm to charge for work necessary to be done on behalf of the plaintiffs in

this case on November 22, 1999, the date of trial;

(c) the court finds that $57,500 is a reasonable charge in this area for work necessary to be done by the attorneys with Mr. Wright's firm in the representation of plaintiffs in this case during the November 23, 1999, to March 13, 2000, time period;

(d) the court concludes, after having considered the factors outlined in *Todd* and *Bowen*, that the fee amounts mentioned in (a), (b), and (c) immediately above should be awarded to plaintiffs against defendant; and

(e) the court concludes, after having considered the *Johnson* factors, that there should be no further adjustment up or down from the lodestar amount in the award made to plaintiffs against defendant for recovery of such attorneys' fees.

For the reasons given above, the judgment of the court will award plaintiffs recovery of $3,078,810.40 as attorneys' fees. The plan of the court is for the judgment to be entered to allocate this award between the Class members on a pro rata basis.

### M.

#### *Judgment to be Entered*

A judgment will be entered pursuant to this memorandum opinion and order resolving all claims that remain in this case other than a claim for recovery of attorneys' fees and other litigation expenses from the Class by counsel for the plaintiffs. In pursuit of that claim, counsel for plaintiffs must file an appropriate motion. The court tentatively has concluded that

---

**15.** Though invited by the court to do so, defendant did not respond to Mr. Wright's affidavit or the submission by plaintiffs' counsel of updated legal expenses. *See* Order of 3/24/00 at 4.

independent counsel will have to be retained to represent the Class against present counsel for the plaintiffs on that claim. And, the court tentatively has concluded that, if an appeal is taken by either side in this action, the claim for recovery by counsel for the plaintiffs from the Class should be held in abeyance until such an appeal has been concluded. Otherwise, the time devoted to that issue could, and probably would, be wasted if this court's judgment were to be reversed or modified on appeal, bearing in mind that the outcome of a claim by Class counsel for compensation from the Class will depend, at least in part, on the ultimate success plaintiffs experience in their claims against defendant.

So that the claim that remains unresolved cannot be viewed to be an impediment to an appeal at this time, the court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to all claims and issues that were resolved by the memorandum opinion and order the court signed February 18, 1999, in this action and all claims and issues that are being resolved by this memorandum opinion and order. The final judgment will be rendered and subject to entry when a written final judgment is signed by the court.

### ORDER

Consistent with the foregoing memorandum opinion and order, The court ORDERS that the Class have and recover $13,625,673.82 from defendant (representing $6,745,409.00 as underpayments reflected by the calculations under Tab L of Agreed Exhibit 139, $3,801,454.42 as interest on the underpayments, and $3,078,810.40 as attorneys' fees);

The court further ORDERS that plaintiffs have and recover from defendant costs of court incurred by plaintiffs; and

The court further ORDERS that, by April 18, 2000, the parties jointly present to the court by a filed document the text of a proposed final judgment to which they have agreed as to form, drawn consistent with this memorandum opinion and order, and in which there is an award to each member of the Class against defendant of his or her share of the recovery contemplated by this memorandum opinion and order.

### REVISION OF AND SUPPLEMENTATION TO APRIL 11, 2000, MEMORANDUM OPINION and ORDER

After having given further consideration to the procedural aspects of the award of attorneys' fees to plaintiffs against defendant, the court has concluded that the April 11, 2000, memorandum opinion and order in this action should be revised and supplemented as it pertains to that subject. From the discussions the court had with counsel by telephone conference on April 25, 2000, the court is of the impression that the parties are in accord that the proposed revision and supplementation should be made.

█ The court has concluded that an award should be made at this time to counsel for the plaintiffs against plaintiffs of attorneys' fees of $3,078,810.40, and that there is no need to provide notice and hearing to the Class before the making of such an award because, as a matter of law, counsel for the plaintiffs should have an award against plaintiffs of attorneys' fees in at least the amount of the attorneys' fees awarded to plaintiffs against defendant.

In order to avoid a circuitry of collection and/or payment as to the award of attorneys' fees, the court has further concluded that the recovery by plaintiffs of $3,078,810.40 as attorneys' fees from defendant should run in favor of counsel for the plaintiffs rather than directly to plain-

tiffs. The final judgment in this action will be drawn and entered in such a manner so that the recovery in such judgment for the members of the Class against defendant will be limited to underpayments in the aggregate amount of $6,745,409.00 and pre-judgment interest on the underpayments in the aggregate amount of $3,801,454.42; and, the judgment will cause defendant's obligations relative to attorneys' fees to be to pay the $3,078,810.40 as attorneys' fees to counsel for plaintiffs and not to the members of the Class.[1]

Therefore,

The court ORDERS that Robert L. Wright, William G. Whitehill, Elaine A. Murphy of Gardere & Wynne, L.L.P., and Thomas F. Dunn of Dunn & Roark, P.C., counsel for plaintiffs, collectively have and recover from plaintiffs as attorneys' fees the aggregate amount of $3,078,810.40;

The court further ORDERS that the award made by the April 11, 2000, memorandum opinion and order in this action to the Class against defendant of $3,078,810.40 as attorneys' fees be, and is hereby, deemed to be an award for the benefit of, and payable by defendant to, counsel for plaintiffs, as named above, so that defendant has no payment obligation directly to plaintiffs as to all or any part of said award of attorneys' fees, and that defendant shall pay the entire $3,078,810.40 award of attorneys' fees to counsel for the plaintiffs, as named above.

Remaining to be disposed of in this action is any claim counsel for the Class wish to make by motion for recovery from the Class of an additional amount as attorneys' fees. So that such potential remaining claim will not be an impediment to an appeal at this time, the court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to all claims and issues that were resolved by the memorandum opinions and orders the court signed February 18, 1999, and April 11, 2000, in this action, and all claims and issues that are being resolved by this revision of and supplementation to the April 11, 2000, memorandum opinion and order.

### EXHIBIT A

| Name (1) | Agreed Exhibit 139 Tab L Underpayment (2) | Pro Rata Allocation of Prejudgment Interest (3) | Total of Underpayment and Prejudgment Interest (2) + (3) (4) | Pro Rata Allocation of Attorneys' Fees (5) | Percentage (6) |
|---|---|---|---|---|---|
| 1. Acker, Ricky | $34,909 | $19,673.38 | $54,582.38 | $15,933.53 | 0.005175224 |
| 2. Adamcik, Ben | 43,386 | 24,450.69 | 67,836.69 | 19,802.69 | 0.00643193 |
| 3. Adams, Alan | 40,194 | 22,651.80 | 62,845.80 | 18,345.77 | 0.00595872 |
| 4. Allen, Dodd | 36,697 | 20,681.03 | 57,378.03 | 16,749.63 | 0.00544029 |
| 5. Allen, Phillip | 32,548 | 18,342.81 | 50,890.81 | 14,855.90 | 0.00482521 |
| 6. Anderson Sr., Jeff | 25,897 | 14,594.56 | 40,491.56 | 11,820.18 | 0.00383920 |
| 7. Anderson, John | 39,788 | 22,422.99 | 62,210.99 | 18,160.46 | 0.00589853 |
| 8. Arledge, Tom | 47,481 | 26,758.47 | 74,239.47 | 21,671.78 | 0.00703901 |
| 9. Autry, Anthony | 30,707 | 17,305.29 | 48,012.29 | 14,015.61 | 0.00455228 |
| 10. Avery, James | 59,711 | 33,650.83 | 93,361.83 | 27,253.92 | 0.00885209 |
| 11. Barron, Glendon | 75,865 | 42,754.61 | 118,619.61 | 34,627.10 | 0.01124691 |
| 12. Barrow, Charles | 30,116 | 16,972.23 | 47,088.23 | 13,745.86 | 0.00446467 |
| 13. Beaird, Walter | 32,515 | 18,324.21 | 50,839.21 | 14,840.84 | 0.00482082 |
| 14. Becker, Greg | 37,371 | 21,060.87 | 58,431.87 | 17,057.26 | 0.00554021 |

1. The seven-page list attached to this Revision Of and Supplementation To April 11, 2000, Memorandum Opinion and Order as Exhibit A shows the names of the plaintiffs, some of whom will not make any monetary recovery, who will be named in the final judgment and gives information needed for an understanding of the dollar amount of the recovery, if any, being made by the individual plaintiffs.

| Name (1) | Agreed Exhibit 139 Tab L Underpayment (2) | Pro Rata Allocation of Prejudgment Interest (3) | Total of Underpayment and Prejudgment Interest (2)+(3) (4) | Pro Rata Allocation of Attorneys' Fees (5) | Percentage (6) |
|---|---|---|---|---|---|
| 15. Becker, Steve | 76,842 | 43,305.22 | 120,147.22 | 35,073.03 | 0.01139175 |
| 16. Blanton, Scott | 19,142 | 10,787.70 | 29,929.70 | 8,736.99 | 0.00283778 |
| 17. Boatright, Greg | 19,239 | 10,842.36 | 30,081.36 | 8,781.27 | 0.00285216 |
| 18. Boniol, Michael | 40,137 | 22,619.68 | 62,756.68 | 18,319.75 | 0.00595027 |
| 19. Bourland, Ronny | 42,954 | 24,207.23 | 67,161.23 | 19,605.52 | 0.00636789 |
| 20. Boyles, Sanford | 24,394 | 13,747.53 | 38,141.53 | 11,134.17 | 0.00361639 |
| 21. Brackett, Tommy | 20,945 | 11,803.80 | 32,748.80 | 9,559.94 | 0.00310507 |
| 22. Brisko, Thomas | 18,970 | 10,690.77 | 29,660.77 | 8,658.49 | 0.00281228 |
| 23. Bronstein, Neil | 47,532 | 26,787.22 | 74,319.22 | 21,695.05 | 0.00704657 |
| 24. Brooks, Lewis | 72,324 | 40,759.04 | 113,083.04 | 33,010.88 | 0.01072196 |
| 25. Brown, Carroll | 3,777 | 2,128.57 | 5,905.57 | 1,723.94 | 0.00055994 |
| 26. Brown, Velma | 23,977 | 13,512.52 | 37,489.52 | 10,943.83 | 0.00355457 |
| 27. Burke, Thomas | 25,122 | 14,157.80 | 39,279.80 | 11,466.45 | 0.00372431 |
| 28. Burleson, Cynthia | 9,527 | 5,369.05 | 14,896.05 | 4,348.41 | 0.00141237 |
| 29. Burrows, Robert | 46,275 | 26,078.82 | 72,353.82 | 21,121.32 | 0.00686022 |
| 30. Butler, Gary | 59,176 | 33,349.33 | 92,525.33 | 27,009.73 | 0.00877278 |
| 31. Call, Dale | 14,575 | 8,213.91 | 22,788.91 | 6,652.47 | 0.00216073 |
| 32. Capley, Luther | 38,368 | 21,622.74 | 59,990.74 | 17,512.33 | 0.00568802 |
| 33. Carlyle, Kevin | 25,777 | 14,526.93 | 40,303.93 | 11,765.41 | 0.00382 141 |
| 34. Carrabba, Joe | 35,147 | 19,807.50 | 54,954.50 | 16,042.16 | 0.00521051 |
| 35. Carter, Eddy | 32,109 | 18,095.40 | 50,204.40 | 14,655.53 | 0.00476013 |
| 36. Cawyer, Roscoe | 29,735 | 16,757.51 | 46,492.51 | 13,571.96 | 0.00440818 |
| 37. Chasteen, Anthony | 33,217 | 18,719.83 | 51,936.83 | 15,161.25 | 0.00492439 |
| 38. Chessmore, Mike | 54,028 | 30,448.11 | 84,476.11 | 24,660.03 | 0.00800960 |
| 39. Cluff, Kathy | 24,278 | 13,682.15 | 37,960.15 | 11,081.22 | 0.00359919 |
| 40. Colbert, Anthony | 20,632 | 11,627.41 | 32,259.41 | 9,417.07 | 0.00305867 |
| 41. Cook, Barry | 29,611 | 16,687.63 | 46,298.63 | 13,515.36 | 0.00438980 |
| 42. Cooper, Bill | 5,666 | 3,193.14 | 8,859.14 | 2,586.14 | 0.00083998 |
| 43. Cooper, Dave | 27,950 | 15,751.55 | 43,701.55 | 12,757.23 | 0.00414356 |
| 44. Cooper, George | 47,448 | 26,739.88 | 74,187.88 | 21,656.71 | 0.00703412 |
| 45. Correll Sr., Willard | 16,266 | 9,166.90 | 25,432.90 | 7,424.30 | 0.00241142 |
| 46. Cox Jr., Elmer | 34,911 | 19,674.50 | 54,585.50 | 15,934.45 | 0.00517552 |
| 47. Cox, James | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 48. Crawford, Marsha | 17,386 | 9,798.08 | 27,184.08 | 7,935.50 | 0.00257746 |
| 49. Cruz, Julie (Saldana) | 1 8,572 | 10,466.47 | 29,038.47 | 8,476.83 | 0.00275328 |
| 50. Cullum, Brooks | 0 | 0.00 | 0.00 | 0.00 | 0.0000000 |
| 51. Curtis–Powel, Leanne | 14,521 | 8,183.48 | 22,704.48 | 6,627.83 | 0.00215272 |
| 52. Cutrer, Arbie Joe | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 53. Dalton, David | 4,766 | 2,685.94 | 7,451.94 | 2,175.35 | 0.00070655 |
| 54. Danford, Gary | 25,433 | 14,333.07 | 39,766.07 | 11,608.40 | 0.00377042 |
| 55. Davis, Jimmy | 39,105 | 22,038.08 | 61,143.08 | 17,848.71 | 0.00579728 |
| 56. Davis, Kenneth | 32,098 | 18,089.20 | 50,187.20 | 14,650.51 | 0.00475850 |
| 57. Dayton, Greg | 41,136 | 23,182.68 | 64,318.68 | 18,775.73 | 0.00609837 |
| 58. De Zeeuw, Mark | 15,966 | 8,997.83 | 24,963.83 | 7,287.37 | 0.00236694 |
| 59. Dean, Dona | 16,882 | 9,514.05 | 26,396.05 | 7,705.46 | 0.00250274 |
| 60. Deibler, Mark | 28,277 | 15,935.84 | 44,212.84 | 12,906.49 | 0.00419204 |
| 61. Dietert, Douglas | 11,690 | 6,588.04 | 18,278.04 | 5,335.67 | 0.00173303 |
| 62. Dolphin, Robert | 15,623 | 8,804.53 | 24,427.53 | 7,130.81 | 0.00231609 |
| 63. Dowling, Jeffery | 10,016 | 5,644.63 | 15,660.63 | 4,571.61 | 0.00148486 |
| 64. Dubois, Parry | 19,047 | 10,734.16 | 29,781.16 | 8,693.63 | 0.00282370 |
| 65. Ducote, Neil | 23,517 | 13,253.28 | 36,770.28 | 10,733.88 | 0.00348687 |
| 66. Duggan, Greg | 22,860 | 12,883.02 | 35,743.02 | 10,434.00 | 0.00338897 |
| 67. Duncan, Fred | 20,656 | 11,640.93 | 32,296.93 | 9,428.03 | 0.00306223 |
| 68. Dyer, Harold S. | 70,749 | 39,871.43 | 110,620.43 | 32,292.00 | 0.01048847 |
| 69. Ely, Gary | 19,222 | 10,832.78 | 30,054.78 | 8,778.51 | 0.00284964 |
| 70. Embree, Barry | 6,226 | 3,508.74 | 9,734.74 | 2,841.74 | 0.00092300 |
| 71. Embree, Julia | 4,410 | 2,485.31 | 6,895.31 | 2,012.86 | 0.00065378 |
| 72. England Jr., Ray | 34,245 | 19,299.17 | 53,544.17 | 15,630.46 | 0.00507679 |
| 73. Esquivel, David | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 74. Eure, Clyde | 8,868 | 4,997.67 | 13,865.67 | 4,047.63 | 0.00131467 |
| 75. Evans, Jack Jr. | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 76. Farley, Chris | 22,513 | 12,687.47 | 35,200.47 | 10,275.62 | 0.00333753 |
| 77. Fernandez, Roberto | 46,9 10 | 26,436.68 | 73,346.68 | 21,411.15 | 0.00695486 |
| 78. Ferrer, Rafael | 27,120 | 15,283.79 | 42,403.79 | 12,378.40 | 0.00402051 |
| 79. Figura, Tim | 29,779 | 16,782.30 | 46,561.30 | 13,592.04 | 0.00441471 |
| 80. Forsythe, James | 25,875 | 14,582.16 | 40,457.16 | 11,810.14 | 0.00383594 |
| 81. Fortner, Ed | 33,334 | 18,785.77 | 52,119.77 | 15,214.65 | 0.00494173 |
| 82. Freeman, James | 40,913 | 23,057.00 | 63,970.00 | 18,673.94 | 0.00606531 |
| 83. Fry, Cynthia Williams | 17,621 | 9,930.52 | 27,551.52 | 8,042.76 | 0.00261230 |
| 84. Fry, Ron | 52,837 | 29,776.91 | 82,613.91 | 24,116.42 | 0.00783303 |
| 85. Fulcher, Floyd | 54,833 | 30,901.78 | 85,734.78 | 25,027.45 | 0.00812894 |
| 86. Gale, Cristi (Curtsinger) | 9,243 | 5,209.00 | 14,452.00 | 4,218.79 | 0.00137027 |
| 87. Garcia, David | 19,080 | 10,752.76 | 29,832.76 | 8,708.69 | 0.00282859 |
| 88. Garrett, Bettie J. | 6,339 | 3,572.42 | 9,911.42 | 2,893.81 | 0.00093975 |
| 89. Gay, Richard | 21,629 | 12,189.28 | 33,818.28 | 9,872.14 | 0.00320648 |
| 90. Gonzalez, Leon | 20,565 | 11,589.65 | 32,154.65 | 9,386.49 | 0.00304874 |
| 91. Goodwin, William | 42,612 | 24,014.49 | 66,626.49 | 19,449.42 | 0.00631719 |
| 92. Gravley, Lowery F. | 3,214 | 1,811.29 | 5,025.29 | 1,466.97 | 0.00047647 |
| 93. Gray, Bruce J. | 17,132 | 9,654.94 | 26,786.94 | 7,819.57 | 0.00253980 |
| 94. Green, Joe T. | 41,089 | 23,128.01 | 64,167.01 | 18,731.45 | 0.00608399 |
| 95. Greenlee, Robert | 27,417 | 15,451.17 | 42,868.17 | 12,513.96 | 0.00406454 |

| Name (1) | Agreed Exhibit 139 Tab L Underpayment (2) | Pro Rata Allocation of Prejudgment Interest (3) | Total of Underpayment and Prejudgment Interest $^?$ (2) + (3) (4) | Pro Rata Allocation of Attorneys' Fees (5) | Percentage (6) |
|---|---|---|---|---|---|
| 96. Gregg, Kimberlyn | 17,082 | 9,626.76 | 26,708.76 | 7,796.75 | 0.00253239 |
| 97. Grosgebauer, Everett | 32,527 | 18,330.97 | 50,857.97 | 14,846.31 | 0.00482209 |
| 98. Hammer, Mike | 32,042 | 18,057.65 | 50,099.65 | 14,624.95 | 0.00475019 |
| 99. Hardy, Kirby | 49,515 | 27,904.76 | 77,419.76 | 22,600.16 | 0.00734055 |
| 100. Harrell, Lisa | 9,537 | 5,374.69 | 14,911.69 | 4,352.98 | 0.00141385 |
| 101. Harrison, Dorothy | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 102. Headrick, Jerry | 52,016 | 29,314.23 | 81,330.23 | 23,741.69 | 0.00771132 |
| 103. Henry, Jeff | 26,819 | 15,114.16 | 41,933.16 | 12,241.01 | 0.00397589 |
| 104. Hertel, William | 9,094 | 5,125.03 | 14,219.03 | 4,150.78 | 0.00134818 |
| 105. Hill, Gregg | 39,603 | 22,318.74 | 61,921.74 | 18,076.02 | 0.00587110 |
| 106. Hiltz, Richard | 20,143 | 11,351.82 | 31,494.82 | 9,193.88 | 0.00298618 |
| 107. Hobbs, Robert | 18,752 | 10,567.91 | 29,319.91 | 8,558.98 | 0.00277996 |
| 108. Holmes, Billy | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 109. Holmes, Houston | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 110. Holmes, Wylie | 43,665 | 24,607.92 | 68,272.92 | 19,930.04 | 0.00647329 |
| 111. Holsemback, Terry | 28,490 | 16,055.87 | 44,545.87 | 13,003.70 | 0.00422361 |
| 112. Hoskins, J.D. | 28,196 | 15,890.19 | 44,086.19 | 12,869.51 | 0.00418003 |
| 113. Hubbard, Everett | 47,955 | 27,025.60 | 74,980.60 | 21,888.12 | 0.00710928 |
| 114. Huff, Robert | 12,631 | 7,118.35 | 19,749.35 | 5,765.17 | 0.00187253 |
| 115. Infante, Juan | 26,174 | 14,750.66 | 40,924.66 | 11,946.61 | 0.00388027 |
| 116. Irvin, Ima | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 117. Jack, Dan | 32,193 | 18,142.74 | 50,335.74 | 14,693.87 | 0.00477258 |
| 118. Jensen, Patricia | 12,498 | 7,043.39 | 19,541.39 | 5,704.47 | 0.00185282 |
| 119. Johnson, Doyle | 40,348 | 22,738.59 | 63,086.59 | 18,416.06 | 0.00598155 |
| 120. Jordan, Kenneth | 32,159 | 18,123.58 | 50,282.58 | 14,678.35 | 0.00476754 |
| 121. Kelley, Tom H. | 72,358 | 40,778.20 | 113,136.20 | 33,026.40 | 0.01072700 |
| 122. Kelly, Claire | 19,235 | 10,840.11 | 30,075.11 | 8,779.44 | 0.00285157 |
| 123. King Jr., James | 6,712 | 3,782.63 | 10,494.63 | 3,063.56 | 0.00099505 |
| 124. Kirkpatrick, Jay | 18,813 | 10,602.29 | 29,415.29 | 8,586.83 | 0.00278901 |
| 125. Kizer, Gary | 28,871 | 16,270.59 | 45,141.59 | 13,177.60 | 0.00428010 |
| 126. Knox, Rebecca | 16,931 | 9,541.66 | 26,472.66 | 7,727.82 | 0.00251000 |
| 127. Kruse, Melvin | 10,926 | 6,157.48 | 17,083.48 | 4,986.96 | 0.00161977 |
| 128. Kuhn, Julie | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 129. Kuhn, Melvin | 18,334 | 10,332.34 | 28,666.34 | 8,368.20 | 0.00271800 |
| 130. Landess, Richard | 49,60 8 | 27,957.17 | 77,565.17 | 22,642.60 | 0.00785434 |
| 131. Laws, Patricia | 28,822 | 16,242.98 | 45,064.98 | 13,155.24 | 0.00427283 |
| 132. Lawson Jr., Daniel | 39,836 | 22,450.05 | 62,286.05 | 18,182.37 | 0.00590565 |
| 133. Lawson, Susan Barre | 17,385 | 9,797.52 | 27,182.52 | 7,935.04 | 0.00257731 |
| 134. Lewis, Hugh | 18,515 | 10,434.35 | 28,949 35 | 8,450.81 | 0.00274483 |
| 135. Loonan, Mike | 42,605 | 24,010.55 | 66,615.55 | 19,446.22 | 0.00631615 |
| 136. Losawyer, Mike | 22,914 | 12,913.45 | 35,827.45 | 10,458.65 | 0.00339698 |
| 137. Luttrell, Larry | 59,156 | 33,338.06 | 92,494.06 | 27,000.60 | 0.00876982 |
| 138. Mahaffey, Monica | 17,993 | 10,140.17 | 28,133.17 | 8,212.55 | 0.00266744 |
| 139. Mahoney, Greg | 33,101 | 18,654.46 | 51,755.46 | 15,108.31 | 0.00490719 |
| 140. Mansfield, Bill | 61,804 | 34,830.37 | 96,634.37 | 28,209.23 | 0.00916238 |
| 141. Marcangelo, John | 40,926 | 23,064.33 | 63,990.33 | 18,679.87 | 0.00606724 |
| 142. Martin Jr., Arvil | 33,725 | 19,006.12 | 52,731.12 | 15,393.12 | 0.00499970 |
| 143. Martin, Robert | 37,345 | 21,046.21 | 58,391.21 | 17,045.40 | 0.00553636 |
| 144. Martinez, Juan | 21,431 | 12,077.69 | 33,508.69 | 9,781.76 | 0.00317712 |
| 145. Mathews, Dina (Winn) | 23,781 | 13,402.06 | 37,183.06 | 10,854.37 | 0.00352551 |
| 146. Matthews, Brent | 9,179 | 5,172.93 | 14,351.93 | 4,189.58 | 0.00136078 |
| 147. Maupin, William (Hank) | 40,734 | 22,956.12 | 63,690.12 | 18,592.24 | 0.00603877 |
| 148. Maynard, Sanford | 27,333 | 15,403.83 | 42,736.83 | 12,475.61 | 0.00405209 |
| 149. McCarthy, J.K. | 35,896 | 20,229.61 | 56,125.61 | 16,384.03 | 0.00532155 |
| 150. McCarthy, Thomas | 12,198 | 6,874.33 | 19,072.33 | 5,567.54 | 0.00180834 |
| 151. McCullin, James | 30,827 | 17,372.92 | 48,199.92 | 14,070.38 | 0.00457007 |
| 152. McGowan Jr., M.L. | 27,886 | 15,715.48 | 43,601.48 | 12,728.02 | 0.00413407 |
| 153. McKnight, Richard | 47,301 | 26,657.03 | 73,958.03 | 21,589.62 | 0.00701232 |
| 154. Meadors, Donald | 50,001 | 28,178.65 | 78,179.65 | 22,821.98 | 0.00741260 |
| 155. Melton, Joe | 57,178 | 32,223.33 | 89,401.33 | 26,097.78 | 0.00847658 |
| 156. Michels, James | 7,767 | 4,377.18 | 12,144.18 | 3,545.10 | 0.00115145 |
| 157. Miller, Denise Parker | 15,797 | 8,902.58 | 24,699.58 | 7,210.23 | 0.00234189 |
| 158. Mix, John | 60,149 | 33,897.67 | 94,046.67 | 27,453.84 | 0.00891708 |
| 159. Moore, William | 55,130 | 31,069.16 | 86,199.16 | 25,163.01 | 0.00817297 |
| 160. Morreira, Karen | 3,026 | 1,705.34 | 4,731.34 | 1,381.16 | 0.00044860 |
| 161. Naik, Ketan | 3,861 | 2,175.91 | 6,036.91 | 1,762.28 | 0.00057239 |
| 162. Neal, Jack | 54,572 | 30,754.69 | 85,326.69 | 24,908.33 | 0.00809024 |
| 163. Needham, Donald | 22,934 | 12,924.72 | 35,858.72 | 10,467.78 | 0.00339994 |
| 164. Neiman, Rosario M. | 20,398 | 11,495.53 | 31,893.53 | 9,310.27 | 0.00302398 |
| 165. Nelson, Elijah | 18,922 | 10,663.72 | 29,585.72 | 8,636.58 | 0.00280517 |
| 166. Parrish, Jimmy | 19,060 | 10,741.49 | 29,801.49 | 8,699.57 | 0.00282 563 |
| 167. Partee, Charles | 26,119 | 14,719.67 | 40,838.67 | 11,921.51 | 0.00387212 |
| 168. Pawless, Joy | 28,566 | 16,098.70 | 44,664.70 | 13,038.39 | 0.00423488 |
| 169. Pawlick, Dale | 57,618 | 32,471.30 | 90,089.30 | 26,298.61 | 0.00854181 |
| 170. Peck, Matt | 21,153 | 11,921.02 | 33,074.02 | 9,654.87 | 0.00313591 |
| 171. Pels, Kevin | 33,600 | 18,935.67 | 52,535.67 | 15,336.06 | 0.00498117 |
| 172. Peters, Ronald | 15,154 | 8,540.21 | 23,694.21 | 6,916.75 | 0.00224657 |
| 173. Petersen, Patti | 16,244 | 9,154.50 | 25,398.50 | 7,414.26 | 0.00240816 |
| 174. Peterson, Scott | 47,083 | 26,534.18 | 73,617.18 | 21,490.12 | 0.00698001 |
| 175. Phillips, Eddie | 27,193 | 15,324.93 | 42,517.93 | 12,411.71 | 0.00403133 |
| 176. Phillips, Melinda (Simmons) | 21,548 | 12,143.63 | 33,691.63 | 9,835.16 | 0.00319447 |

| Name (1) | Agreed Exhibit 139 Tab L Underpayment (2) | Pro Rata Allocation of Prejudgment Interest (3) | Total of Underpayment and Prejudgment Interest * (2) + (3) (4) | Pro Rata Allocation of Attorneys' Fees (5) | Percentage (6) |
|---|---|---|---|---|---|
| 177. Philpot, Bruce | 36,410 | 20,519.28 | 56,929.28 | 16,618.63 | 0.00539775 |
| 178. Pidgeon, Thurman | 31,900 | 17,977.62 | 49,877 62 | 14,560.13 | 0.00472914 |
| 179. Pierson, Kerry | 30,979 | 17,458.58 | 48,437.58 | 14,139.76 | 0.00459261 |
| 180. Plemons, Michael | 38,678 | 21,797.44 | 60,475.44 | 17,653.82 | 0.00573397 |
| 181. Pollard, Rock | 20,218 | 11,394.09 | 31,612.09 | 9,228.11 | 0.00299730 |
| 182. Pratt, Becky | 17,872 | 10,071.98 | 27,943.98 | 8,157.33 | 0.00264951 |
| 183. Puetz, Gerry | 7,816 | 4,404.80 | 12,220.80 | 3,567.46 | 0.00115871 |
| 184. Rangel, Sam | 26,980 | 15,204.90 | 42,184.90 | 12,314.49 | 0.00399976 |
| 185. Reece, Thomas | 19,788 | 11,151.76 | 30,939.76 | 9,031.85 | 0.00293355 |
| 186. Reswik, Timothy | 19,938 | 11,236.29 | 31,174.29 | 9,100.31 | 0.00295579 |
| 187. Risner, Charles | 63,248 | 35,644.15 | 98,892.15 | 28,868.32 | 0.00937645 |
| 188. Rodgers, Scott | 7,877 | 4,439.18 | 12,316.18 | 3,595.30 | 0.00116776 |
| 189. Rodriguez, Efrain | 25,983 | 14,643.02 | 40,626.02 | 11,859.43 | 0.00385195 |
| 190. Rodriguez, Roland | 20,189 | 11,377.75 | 31,566.75 | 9,214.88 | 0.00299300 |
| 191. Rohrer, John | 20,019 | 11,281.94 | 31,300.94 | 9,137.28 | 0.00296780 |
| 192. Rothmeyer, K. | 34,312 | 19,336.93 | 53,648.93 | 15,661.04 | 0.00508672 |
| 193. Rousseil, John | 35,470 | 19,989.53 | 55,459.53 | 16,189.59 | 0.00525889 |
| 194. Scoggins, Frances | 20,418 | 11,506.80 | 31,924.80 | 9,319.40 | 0.00302695 |
| 195. Settle, Leslie | 17,321 | 9,761.45 | 27,082.45 | 7,905.83 | 0.00256782 |
| 196. Shackelford, Tom | 30,274 | 17,061.27 | 47,335.27 | 13,817.98 | 0.00448809 |
| 197. Shedenhelm, Larry | 26,079 | 14,697.13 | 40,776.13 | 11,903.25 | 0.00386619 |
| 198. Shermer, Dayton | 27,129 | 15,288.87 | 42,417.87 | 12,382.50 | 0.00402185 |
| 199. Shipley, Thomas L. | 34,452 | 19,415.83 | 53,867.83 | 15,724.94 | 0.00510747 |
| 200. Shivers, John | 60,030 | 33,830.61 | 93,860.61 | 27,399.52 | 0.00889939 |
| 201. Skipworth, Ronald | 30,289 | 17,069.72 | 47,358.72 | 13,824.82 | 0.00449081 |
| 202. Slovacek, Yvonne | 3,999 | 2,253.68 | 6,252.68 | 1,825.27 | 0.00059285 |
| 203. Smith, Dennis | 18,490 | 10,420.26 | 28,910.26 | 8,439.40 | 0.00274112 |
| 204. Smith, Gregory | 14,743 | 8,308.59 | 23,051.59 | 6,729.15 | 0.00218563 |
| 205. Smith, Marylin | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 206. Snee, Langford | 42,978 | 24,220.76 | 67,198.76 | 19,616.47 | 0.00637144 |
| 207. Song, Dennis | 17,862 | 10,066.34 | 27,928.34 | 8,152.76 | 0.00264802 |
| 208. Spofford, David | 37,502 | 21,134.69 | 58,636.69 | 17,117.06 | 0.00555963 |
| 209. Sprabary, Jack | 37,322 | 21,033.25 | 58,355.25 | 17,034.90 | 0.00553295 |
| 210. Standifer, James Steve | 36,741 | 20,705.82 | 57,446.82 | 16,769.71 | 0.00544682 |
| 211. Stark, Barbara | 10,588 | 5,966.99 | 16,554.99 | 4,832.69 | 0.00156966 |
| 212. Stiles, James | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 213. Stockton, Robert | 3,887 | 2,190.56 | 6,077.56 | 1,774.15 | 0.00057624 |
| 214. Stowie, Cherie | 19,538 | 11,010.87 | 30,548.87 | 8,917.74 | 0.00289649 |
| 215. Tate, Chris | 27,834 | 15,686.18 | 43,520.18 | 12,704.29 | 0.00412636 |
| 216. Taylor, Mike | 41,552 | 23,417.12 | 64,969.12 | 18,965.60 | 0.00616004 |
| 217. Teague, William M. | 30,567 | 17,226.39 | 47,793.39 | 13,951.71 | 0.00453153 |
| 218. Tort, Mario | 21,449 | 12,087.84 | 33,536.84 | 9,789.98 | 0.00317979 |
| 219. Trapp, Stephen | 40,156 | 22,630.39 | 62,786.39 | 18,328.42 | 0.00595309 |
| 220. Traver, Bert | 37,454 | 21,107.64 | 58,561 64 | 17,095.15 | 0.00555252 |
| 221. Treadway, Lee | 13,946 | 7,859.43 | 21,805.43 | 6,365.38 | 0.00206748 |
| 222. Trewin, Ellen | 14,336 | 8,079.22 | 22,415.22 | 6,543.39 | 0.00212530 |
| 223. Tribble, Patricia | 12,868 | 7,251.91 | 20,119.91 | 5,873.35 | 0.00190767 |
| 224. Turner, Tommy | 63,465 | 35,766.45 | 99,231.45 | 28,967.36 | 0.00940862 |
| 225. Tuttle, Lonnie | 24,396 | 13,748.65 | 38,144.65 | 11,135.08 | 0.00361668 |
| 226. Wallick, Scott | 37,678 | 21,233.88 | 58,911.88 | 17,197.39 | 0.00558573 |
| 227. Ward, Judy | 8,961 | 5,050.08 | 14,011.08 | 4,090.07 | 0.00132846 |
| 228. Warner, Jeff | 30,926 | 17,428.71 | 48,354.71 | 14,115.57 | 0.00458475 |
| 229. Warren, Wendell | 11,893 | 6,702.44 | 18,595.44 | 5,428.33 | 0.00176813 |
| 230. Washington, Archie | 29,056 | 16,374.85 | 45,430.85 | 13,262.04 | 0.00430752 |
| 231. Wellesley, Arthur L. | 47,873 | 26,979.39 | 74,852.39 | 21,850.70 | 0.00709712 |
| 232. Wilkinson, Lua | 17,727 | 9,990.26 | 27,717.26 | 8,091.14 | 0.00262801 |
| 233. Willey, William | 45,293 | 25,525.40 | 70,818.40 | 20,673.11 | 0.00671464 |
| 234. Williams, Barbara | 3,279 | 1,847.92 | 5,126.92 | 1,496.64 | 0.00048611 |
| 235. Williams, Benny | 28,465 | 16,041.78 | 44,506.78 | 12,992.29 | 0.00421991 |
| 236. Williams, James | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 237. Williams, John | 64,584 | 36,397.07 | 100,981.07 | 29,478.11 | 0.00957451 |
| 238. Williams, Ricky E. | 33,993 | 19,157.15 | 53,150.15 | 15,515.44 | 0.00503943 |
| 239. Wilson, James | 7,996 | 4,506.24 | 12,502.24 | 3,649.62 | 0.00118540 |
| 240. Witherington, Richard | 36,714 | 20,690.61 | 57,404.61 | 16,757.39 | 0.00544281 |
| 241. Wong, Alex | 0 | 0.00 | 0.00 | 0.00 | 0.00000000 |
| 242. Woodson, Douglas | 61,422 | 34,615.09 | 96,037.09 | 28,084.87 | 0.00910575 |
| 243. Youngblood, Mike | 41,219 | 23,229.45 | 64,448.45 | 18,813.61 | 0.00611067 |
| 244. Zigrang, William | 27,483 | 15,488.37 | 42,971 37 | 12,544.08 | 0.00407433 |
| | $6,745,409 | $3,801,454.42 | $10,546,863.42 | $3,078,810.40 | 1.00000 000 |
| Amount to Allocate: | | 3,801,454.42 | 10,546,863.42 | 3,078,810.40 | |

* This calculation does not include the award of costs, post-judgment interest or attorney's fees under the common fund doctrine.