Joe CARRABBA, Jr., et al., Plaintiffs,

v.

**RANDALLS FOOD MARKETS, INC., Defendant.**

No. 4:96–CV–651–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

March 13, 2002.

Robert L. Wright and William G. Whitehill, Gardere Wynne Sewell, Dallas, TX, Thomas F. Dunn, Arlington, TX, for themselves.

John P. Camp, Fort Worth, TX, Court-Appointed Attorney for Class Representatives.

J. Lyndell Kirkley, Fort Worth, TX, Court-Appointed Attorney for Class Members.

### MEMORANDUM OPINION and ORDER

MCBRYDE, District Judge.

Before the court for consideration and decision are the requests for relief made in the document filed November 9, 2001, titled "Class Counsel's Amended Application for Common Fund Recovery." For the reasons given below, the court has concluded no attorneys' fees should be paid from the common fund, that the common fund should bear certain of the unreimbursed expenses incurred by the attorneys for the class, and that the named plaintiffs/class representatives should not receive bonus, incentive, or expense reimbursement payments from the common fund.

### I.

#### The Application

Attorneys for the plaintiffs in the above-captioned class action, Robert L. Wright

("Wright") and William G. Whitehill ("Whitehill") of the Dallas, Texas, firm of Gardere Wynne Sewell LLP (formerly Gardere & Wynne, L.L.P.) ("Gardere Wynne"), and Thomas F. Dunn ("Dunn") of the Arlington, Texas, firm of Dunn & Roark, P.C., (collectively "Attorneys"), seek, *inter alia*, expense reimbursement and additional compensation from the fund now in the registry of the court by reason of the recoveries of the plaintiff class members against defendant, Randalls Food Markets, Inc., ("Randalls") through the April 26, 2000, final judgment in this action ("Fund"). The judgment awarded Attorneys, collectively, $3,078,810.40, plus post-judgment interest thereon, as attorneys' fees, and the class plaintiffs, collectively, $10,546,859.42, plus post-judgment interest.

In August 2001, as appellate activity in this case was nearing an end, Randalls paid into the registry of the court $14,724,778.42, representing the total of the awards made by the April 26, 2000, judgment, plus post-judgment interest through August 13, 2001. On November 9, 2001, ten days after appellate activity was concluded, Attorneys filed a motion asking that they be paid out of the registry fund their $3,078,810.40 fee award, plus the share of the post-judgment interest attributable to that amount. Pursuant to that request, in November 2001 $3,350,753.66 was disbursed by the Clerk to Attorneys.

Attorneys now are asking the court to order that they be paid out of Fund another $1,851,842.77 ($1,389,680.46 as additional attorneys' fees and $462,162.31 as additional reimbursement for litigation expenses.)[1] They also are asking the court to order disbursed out of the Fund $525,000 to be paid to the thirty-five named plaintiffs, at the rate of $15,000 per plaintiff, as bonuses for having participated as the named plaintiffs/class representatives in this litigation.

The application is accompanied by an appendix containing: a declaration of Wright by which he identifies, and discusses, in a general way other items contained in the appendix; a list of thirty attorneys with the firm of Gardere Wynne who put billable hours in this case; three sets of billing statements and related listings showing services rendered and expenses incurred by Gardere Wynne, consisting of approximately 250 pages of itemizations of work done by lawyers with Gardere Wynne starting on July 1, 1996, and ending October 19, 2001; a summary, and listings (approximately 125 pages in length), of non-taxable expenses incurred by Gardere Wynne; billing statements of Dunn & Roark, with itemizations similar to the itemizations provided relative to work done by lawyers at Gardere Wynne, covering the time period May 28, 1996, through February 3, 2000; and, miscellaneous items and case authorities presented by Attorneys as having relevance to their application.

## II.

### History of the Litigation

This action was instituted on September 17, 1996, by the filing by Attorneys on behalf of four named plaintiffs of a complaint alleging that the plaintiffs were suing on behalf of themselves and a class of persons who were or had been employees of Randalls, or one of its predecessors, to recover under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001–1461, employee pension plan benefits and other re-

---

**1.** Attorneys already have been reimbursed by Randalls for taxable costs of court in the amount of $34,063.26.

lief. The claims arose from the alleged failure of the employer to pay the named plaintiffs and the class members the benefits to which they were entitled under the plan and applicable law when and after the plan was terminated in December 1992. Attorneys, after obtaining leave to do so, filed five amended complaints, the first on October 4, 1996, adding eight named plaintiffs, the second on November 5, 1996, adding six named plaintiffs, the third on May 8, 1997, adding thirteen named plaintiffs, the fourth on June 3, 1997, adding one named plaintiff, the fifth on June 30, 1997, adding two named plaintiffs, and the sixth on September 17, 1997, adding one more named plaintiff, for a total of thirty-five. From that point forward the case proceeded with thirty-five named plaintiffs, who, at the request of Attorneys, also were certified by the court as representatives of the class on whose behalf the action was brought.

On December 6, 1996, January 30, 1997, February 25, 1997, and April 25, 1997, respectively, the court granted joint requests of the parties for extensions of time for the filing of a motion for class certification. The motion was filed May 7, 1997. On May 23, 1997, June 23, 1997, July 15, 1997, and July 30, 1997, respectively, the court granted joint requests for extensions of time for the filing of a response to the motion. Defendants[2] filed their memorandum in opposition to class certification on August 22, 1997. On June 16, 1998, the court certified the class for the liability phase of the case, and ordered notification to the class members.

In the meantime, on December 30, 1997, the court ruled on plaintiffs' motion for partial summary judgment, and the motion and supplemental motion of defendants for partial summary judgment. The ruling was in favor of defendants as to one of the elements of the contention of the defen-

dants that the plan was a "top hat" plan; and, the court ruled in favor of the defendants as to certain claims made by plaintiffs in their sixth amended complaint.

The foregoing overview of the first two years of the pendency of this litigation leads to the October 26, 1998, non-jury trial on the issue of whether the pension plan in question was exempt from ERISA requirements, such as vesting, funding, trusteeship, reporting, and disclosure, by virtue of being a "top hat" plan. The trial evidence and outcome are the subjects of the court's February 18, 1999, memorandum opinion and order, published as *Carrabba v. Randalls Food Markets, Inc.,* 38 F.Supp.2d 468 (N.D.Tex.1999). The history of the damage phase of this case, through entry of the final judgment, is discussed in the memorandum opinion and order the court signed April 11, 2000, and revised and supplemented April 26, 2000, published as *Carrabba v. Randalls Food Markets, Inc.,* 145 F.Supp.2d 763 (N.D.Tex.2000).

Cross-appeals were taken by the parties to the United States Court of Appeals for the Fifth Circuit, which affirmed the judgment of the trial court on May 22, 2001. 252 F.3d 721 (5th Cir.2001). Plaintiffs, through Attorneys, petitioned the Supreme Court for writ of certiorari. The petition was denied October 29, 2001. 122 S.Ct. 463, 151 L.Ed.2d 380 (2001).

### III.

*Procedural Steps Taken After Attorneys Filed on November 9, 2001, Their Application for Common Fund Recovery*

On November 15, 2001, the court appointed J. Lyndell Kirkley ("Kirkley"), a member of the bar of this court, to assist the court by serving as an advocate (1) on behalf of all members of the Class who

---

2. In the early stages of this litigation there were three defendants.

made monetary recovery in the April 26, 2000, judgment on the issue of whether Attorneys should recover additional attorneys' fees and litigation expenses out of the Fund, and, if so, the amount they should recover, and (2) on behalf of all members of the Class except the thirty-five named plaintiffs/class representatives on the issue of the bonuses, if any, to be paid to the named plaintiffs/class representatives from the Fund; and, the court appointed John P. Camp ("Camp"), a member of the bar of this court, to assist the court by serving as an advocate on behalf of the named plaintiffs/class representatives on the issue of whether they should be paid bonuses out of the Fund, and, if so, the amounts they should be paid.

The November 15 order: directed Attorneys to provide to Kirkley and Camp certain material and information they would need in the performance of the duties assigned to them by the court; directed Attorneys to provide certain other information and material to the court and the court-appointed attorneys; directed the court-appointed attorneys to make reports to the court by January 15, 2002, each giving his recommendations on the issue or issues with which he was to be concerned; and, ordered that Attorneys send a copy of the order to each member of the class. The class members were informed by the order of their right to express their views on any of the subjects mentioned in the order by the filing with the Clerk of an appropriate document by December 17, 2001.

Kirkley and Camp timely filed their reports; Attorneys responded to Kirkley's report; and, Kirkley replied to the response. The court received twenty-seven written communications from class members objecting to all or part of the relief sought by Attorneys' application. A recurring complaint was that the filing by Attorneys of the application has further delayed resolution of this case and disbursement to the class members of their recovery from Randalls. Another complaint was that the application was the first notice anyone had that bonuses would be requested for the named plaintiffs. Some of the communications said that the views expressed were representative of the views of other class members who would not separately be communicating with the court. Criticism was expressed of the decision to appeal from this court's judgment, thereby delaying distribution of the Fund to the class members. No responding class member favored any of the relief sought by the application.

During a March 5, 2002, telephone conference the court had with Wright, Whitehill, Kirkley, and Camp, the court was informed by Wright that Attorneys did not wish to offer additional evidence in support of the application; and, the impression of the court was that neither Kirkley nor Camp wished to provide the court evidence. The court requested Attorneys to provide additional materials, consisting of copies of all documents filed by either side in the Fifth Circuit and Supreme Court during the appellate process, a list of discovery directed to the named plaintiffs, specimens of transcripts of oral depositions of the named plaintiffs, and reports of the consultants and experts. Those items have been furnished; and, along with the items previously provided, they have been reviewed by the court.

IV.

*The Fee–Shifting Award Attorneys Already Have Been Paid*

In their complaint plaintiffs sought an award of attorneys' fees and costs of action from Randalls under the authority of 29 U.S.C. § 1132(g), which provides, in pertinent part, that "[i]n any action under [ERISA] ... by a participant ... the

court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The recovery against Randalls in the amount of $3,078,810.40 was pursuant to that statutory provision. In the final judgment, that recovery was treated as an award to Attorneys. It is the award that, together with post-judgment interest thereon, was paid to Attorneys out of the registry of the court in November 2001. *See supra* at 818.

The discussion of the factors that led to that award appears in the April 11, 2000, memorandum opinion. 145 F.Supp.2d at 776–80. In advance of the trial of the damage issues, counsel for Randalls agreed by letter to Wright that "Randall's [sic] will not contest the reasonableness of your hourly rates, the fact that you have expended on this case the number of hours that you say you have expended, or the reasonableness of the number of hours expended." App. to Application, tab 10. Consistent with that agreement, the trial evidence offered by Attorneys in support of the fee-shifting award went virtually unchallenged by Randalls. While Randalls challenged the request of Attorneys that there be an award against Randalls of a multiple of the lodestar amount, it did not question the need for the attorneys to do the work shown on Agreed Exhibit 179, nor did Randalls contend that Attorneys devoted too many personnel or too much time to any of the work upon which the fee claim was based.[3]

Indeed, the first challenge of any kind by Randalls of an award of the lodestar amount[4] was made in an argument, two paragraphs in length, in Randalls' post-trial brief filed January 25, 2000. The sum

and substance of Randalls' argument was that the court should not award lodestar fees for work done by the attorneys on the damage phase of the case because, Randalls argued, plaintiffs really did not prevail in that phase of the litigation. Randalls suggested, without providing any analysis, that the court arbitrarily reduce the lodestar fees 25% because "[t]he damage phase of this case began on February 18, 1999, and has taken up approximately 25% of this lawsuit's life." Def.'s Post–Trial Br. at 66. The court rejected that argument because plaintiffs did prevail in the damage phase of the case, even though the damage award to the class was significantly lower than the award sought by plaintiffs.

Agreed Exhibit 180 showed work of Dunn related to this case. The court denied any award for that work because there was no evidence that any of Dunn's activities was necessary to the prosecution of the class' claims. And, the court denied recovery for any of the litigation expenses, in the amount of $373,491.93 as of that time, about which Wright testified at trial because there was no evidence that would support such an award against Randalls.

The trial evidence about attorneys' fees did not concern work done by Attorneys immediately prior to or during trial or work anticipated to be done post-trial, including an anticipated appeal, other than the testimony given by Wright that:

> [W]e anticipate that the amount of time spent trying the case, attending to post-trial matters, including motions and briefing and whatever the Court would desire there, together with the amount

---

3. Agreed Exhibit 179 is the trial exhibit itemizing the pre-trial legal work done on this case by attorneys with Gardere Wynne.

4. The Third Circuit explained the lodestar fee as follows:

> The court must start by taking the amount of time reasonably expended by counsel for the prevailing party on the litigation, and compensate that time at a reasonable hourly rate to arrive at the lodestar.
> *Brytus v. Spang & Co.,* 203 F.3d 238, 242 (3d Cir.2000).

of time that we would spend in the event of an appeal to the Fifth Circuit, and a further appeal, if allowed to the United States Supreme Court, we're estimating that the total fees for all of that would be an additional $250,000.

Tr. of 11/22/99 trial at 135–36 (145 F.Supp.2d at 779).

By a post-trial order signed March 16, 2000, the court directed plaintiffs to file itemized lists, verified by an affidavit or affidavits, of "all legal expenses (attorneys' fees and other litigation expenses) incurred by plaintiffs in connection with the prosecution of this action since the ending dates shown on Agreed Exhibits 179 and 180 . . . ." 3/16/00 Order at 1–2. On March 24, 2000, Attorneys responded by advising the court that Attorneys had generated a total of $325,086.50 as additional attorneys' fees and had incurred additional legal expenses of $135,571.06 during the two weeks immediately prior to trial, at the one-day trial, and in preparation of a post-trial brief and a post-trial reply, for a total of $460,657.56.

Thus, after having prepared only two relatively simple post-trial briefs that dealt with subjects that had been extensively briefed and presented in writing before, Attorneys represented to the court that they had incurred almost twice the amount Wright predicted in his trial testimony as the total for all time devoted to the trial and that would be devoted to post-trial and appellate proceedings. Notwithstanding this unusual post-trial presentation, Randalls did not respond, even though its attorneys knew the court would take into account the post-trial submission in deciding what, if any, attorneys' fees and costs to award against Randalls. Nevertheless, the court, on its own initiative, made significant downward adjustments in the attorneys' fees itemized in the post-trial submission when evaluating the fee-shifting

award to be made. *See* 145 F.Supp.2d at 779–780.

Except the adjustments mentioned in the immediately preceding sentence, the award of attorneys' fees made to Attorneys against Randalls by the final judgment in this action was exactly the amount claimed for work done by the Gardere Wynne attorneys. No further adjustment was made because of unproductive, excessive, or redundant hours. With respect to the pre-trial (Agreed Exhibit 179) fees, the court expressed the following finding and conclusion:

The court finds that the attorneys' fees incurred through Mr. Wright's firm about which trial evidence was received were necessary to be incurred in the prosecution of plaintiffs' claims against defendant in this action and that all are reasonable in amount to be charged in this geographical area. Therefore, there being no basis in the evidence for a reduction below the lodestar amounts, an award is being made to plaintiffs against defendant for recovery of those fees.

145 F.Supp.2d at 778.

And, the court concluded that plaintiffs should not recover from Randalls any enhancement over the lodestar amount. But, the court reserved "for future decision the issue of whether, under the trust fund doctrine, counsel for the plaintiffs should recover some additional amount as attorneys' fees from the Class." *Id.* at 778–79.

The court concluded that it should not make an award for anticipated legal expenses on appeal, saying "[i]f an appeal is taken, the Court of Appeals can deal with the issue of whether attorneys' fees should be awarded for time devoted to such an appeal, either by making the award itself or by directing this court to revisit that issue post-appeal." *Id.* at 779.

## V.

*Pertinent Common Fund Principles*

■ The Supreme Court recognized the common fund doctrine in *Trustees v. Greenough*, 105 U.S. (15 Otto) 527, 26 L.Ed. 1157 (1881), when the Court held that an individual plaintiff was entitled to recover from a common fund the attorneys' fees he had paid during the litigation that created the fund for the benefit of others. By way of explanation, the Court said:

The conclusion to which we have come is that, under the circumstances of this case, the Circuit Court had the power, in its discretion, to allow to the complainant, Vose, his reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit, and in reclaiming and rescuing the trust fund and causing it to be subjected to the purposes of the trust.

*Id.* at 537. The Court said that the trial court "should have considerable latitude of discretion on the subject, since it has far better means of knowing what is just and reasonable than an appellate court can have." *Id.* In *Boeing Co. v. Van Gemert*, the Supreme Court cited *Greenough* and another early Supreme Court decision for the proposition that the Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The Court added that "[t]he doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id.*

Somewhat in point here is *Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir.2000). There, the attorneys in a class action were successful in their suit under ERISA against the sponsor of a pension plan who had terminated the plan and seized the surplus plan assets. The attorneys sought recovery of attorneys' fees both under the statutory fee-shifting provision and from the fund recovered on behalf of the class. An agreement was reached that the employer would pay the successful attorneys $460,000 in attorneys' fees and expenses, pursuant to ERISA's statutory fee provision. But, the union representing the members of the class opposed payment of any additional fee from the common fund created through the work of the attorneys. The trial court denied the application for recovery of fees from the common fund. This denial was the issue on appeal.

In the course of affirming the denial, the Third Circuit noted that "the fact that a common fund has been created does not mean that the common fund doctrine must be applied in awarding attorney's fees ...." *Id.* at 243. The argument made by the attorneys in *Brytus* in support of their contention that they should receive an award from the common fund in addition to the fee-shifting award they had received was that such an additional award was necessary "to account for the contingent nature of the undertaking and the result achieved." *Id.* As the *Brytus* court noted, "[t]he ultimate goal in these cases is the award of a 'reasonable' fee to compensate counsel for their efforts, irrespective of the method of calculation." *Id.* at 247.

■ However, the court must remember that in a class action context the court has fiduciary obligations to the absent class members, and, in a sense, acts as a guardian of their rights. *See Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir.1975). More to the point, "[t]he court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications," *Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th

Cir.1988); and, a fee request from a common fund created in a class action is subject to heightened judicial scrutiny, *id.* As the First Circuit put it in *Weinberger v. Great Northern Nekoosa Corp.*,

> The court's role as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services. Rather, the court should scrutinize fee applications carefully.

925 F.2d 518, 525 (1st Cir.1991). In deciding the propriety of an attorney fee request, the court to an extent acts as an expert itself, and may consider its own knowledge and experience in making the determination. *See Davis v. Nat'l Med. Enters., Inc.*, 253 F.3d 1314, 1322 n. 12 (11th Cir.2001).

## VI.

### *The Court is Denying Payment of Additional Attorneys' Fees from the Fund*

The court's understanding is that the main, if not the sole, justifications Attorneys advance for their request for additional fees from the Fund are that (1) when they undertook representation of the plaintiffs on a contingency basis, they were exposed to the risk of receiving no payment for their work, and (2) the fee shifting award slights them because it was paid long after they performed their legal services, resulting in an investment value financial loss to Attorneys. They do not consider that the $3,350,753.66 payment they have already received adequately recognizes those factors.

### A. *Attorneys' Hours that are Being Disregarded in Reaching a Decision.*

Attorneys, nevertheless, are asking the court to take into account all the hours of attorney time shown in the billing statements they submitted with their application in evaluating whether there is justification for payment of an additional fee from the Fund, and, if so, what the additional amount should be. Therefore, at the outset of this analysis, the court is making known certain attorney work time shown on the attorneys' itemizations that the court is disregarding in the making of a determination.

### 1. *Hours of Work Attributed to Dunn.*

■ The appendix to the application contains under tab 7 listings of the work Attorneys say Dunn did in connection with this case starting on May 28, 1996, going through February 3, 2000. The items under that tab are copies of Agreed Exhibit 180 and Plaintiffs' Exhibit 180–A, which is one of the items Attorneys provided to the court on March 24, 2000, in response to the directive of the March 16, 2000, order. *See supra* at 821–22. For reasons previously given in the April 11, 2000, memorandum opinion and order, the court has no basis upon which the court can conclude that Attorneys should be compensated for any of Dunn's work. 145 F.Supp.2d at 777–78, 779. Wright has represented to the court that Dunn served on the defense team as an expert on ERISA law. However, nothing provided the court discloses any meaningful contribution made by Dunn in that capacity.

The very first entry in Agreed Exhibit 180, which is dated May 28, 1996, shows that on that date Mr. Dunn had a "[t]elephone conference with Mr. Carrabba and Mr. Miller regarding class action against Tom Thumb." App. to Application, tab 7 at 1 (Agreed Ex. 180 at 1). That is the earliest dated entry in any of the records provided to the court describing work done by any of the attorneys. It is followed by an entry the very next day showing that Dunn prepared a letter to Wright regarding potential class action plaintiffs. "Mr. Carrabba" is Joe Carrabba, Jr., the first

named of the named plaintiffs. Thus, the indication is that Dunn's primary role was to provide the client through whom the class litigation was developed. Dunn's role of providing a client to Gardere Wynne was important to the class in the sense that it provided the medium for pursuit of the litigation through competent attorneys.[5] However, there simply is no evidence that he did any attorney work for the class that furthered its interests. Consequently, the court is giving no weight to the work the exhibits show was performed by Dunn.

2. *The Post–Trial and Pre–Appeal Hours of Attorneys with Gardere Wynne.*

Included in the appendix, under tab 4, is a copy of the itemization mentioned in the April 11, 2000, memorandum opinion and order as having been submitted post-trial showing charges for work done by lawyers with Gardere Wynne from November 4, 1999, through March 13, 2000, in the total amount of $325,086.50. 145 F.Supp.2d at 779. For the reasons given in the April 11 memorandum opinion and order, the court is disregarding all but $189,067.00 of those charges.

3. *The Attorney Work Related to the Appeals.*

The Gardere Wynne time records under tab 5 in the appendix to the application show that attorneys with that firm did $532,969.50 of billable legal work on this case from March 19, 2000, through October 19, 2001. Most of this time was devoted to appellate work—preparing for and pursuing the appeal to the Fifth Circuit

and then to the Supreme Court in the name of the class, and defending Randalls' cross-appeal to the Fifth Circuit. For the reasons given below, the court has concluded that it should disregard all the time devoted to appellate work.

a. *Time Devoted to the Appeal Pursued by Attorneys on Behalf of the Class.*

■ After having studied the briefs filed in the Fifth Circuit and then with the Supreme Court in the appeal taken by plaintiffs, complaining that the recovery awarded them by this court was inadequate, the court is not persuaded that Attorneys exercised good judgment in pursuing such an appeal. The appeal certainly did not benefit members of the class.

Plaintiffs could have settled the case shortly after final judgment was entered in April 2000 for about $1,400,000 more than the total of the awards made in the judgment. The court is of the belief that prudent attorneys would have caused such a settlement to be made. If they had, distribution to the class members of their recoveries would not have been delayed for almost two years, and there would have been a significant increase in the fund available for distribution to the class members. The court has concluded that plaintiffs had only slight, if any, chance of success in their appeal. Presumably, Attorneys could have influenced the decision whether to appeal; and, communications the court has received from class members indicate that at least some of the class members were not parties to a decision to appeal.

5. The record indicates that Dunn was to receive one-third of whatever fee award is made to Attorneys in this case. Assuming he received that share, Dunn appears to have received an unconscionable fee for his role in this litigation. However, the court is not called upon to make a ruling on that issue.

Gardere Wynne, and not the members of the class, are the ones who will suffer financially from any inappropriate sharing of the attorneys' fee recovery with Dunn. The court does note, to the credit of Dunn, an awareness that "referral fees" of this kind are not uncommon in the plaintiff bar.

For the reasons given, the court is not giving any weight to the time Attorneys' devoted to pursuit of the appeal taken on behalf of plaintiffs.

### b. *Time Devoted to the Defense of Randalls' Cross–Appeal.*

■ The court is satisfied that Randalls would not have pursued an appeal had plaintiffs not appealed. Obviously Randalls would not have indicated, as Attorneys say they did, shortly after the April 26, 2001, judgment was entered that Randalls would conclude the case at that time by a settlement payment to the class of $15,000,000 if it had any serious thought that it could successfully pursue an appeal. Consequently, even though Attorneys, on behalf of the class, prevailed in the cross-appeal, the work they did to that end was not productive for the class in the overall scheme of things.

Moreover, so far as the court can determine, Attorneys did nothing to seek a fee-shifting recovery from Randalls related to work they did in opposition to the cross-appeal.[6] In the April 11, 2000, memorandum opinion and order, the court declined to make an award for anticipated legal expenses on appeal, explaining that it was leaving that issue to be dealt with by the Court of Appeals. *Supra* at 822. The course suggested by the court appears to be the procedure that should have been followed by Attorneys, on behalf of the class, if Attorneys wished to gain compensation for attorneys' fees incurred in defense of the cross-appeal. *See League of United Latin Am. Citizens v. Roscoe Indep. Sch. Dist.,* 119 F.3d 1228, 1236 (5th Cir.1997).

Therefore, the court is not taking into account any time devoted to work on the cross-appeal. Moreover, even if the court were to consider compensation to Attorneys for that work, Attorneys failed to provide the court any information that would enable the court to isolate out time devoted to the cross-appeal.

### B. *The Fee–Shifting Award is More Than Adequate to Compensate Counsel for Their Work on Behalf of the Class.*

■ Once the attorney time mentioned in subsection A above is disregarded, the only work done by Attorneys to be considered on the issue of an additional fee award is the work the court took into account in deciding the amount of the fee-shifting award in favor of Attorneys against Randalls—the $2,889,743.40 total for all the work shown on Agreed Exhibit 179, commencing July 1, 1996, through November 4, 1999, plus the pre-trial, trial, and post-trial work for which a fee award was made in the manner described in the April 11, 2000, memorandum opinion and order. 145 F.Supp.2d at 780. The court has concluded from an analysis of the time records of the Gardere Wynne attorneys that the fee-shifting award is more than sufficient to provide Attorneys a reasonable fee as compensation for their efforts.

Because of the failure of Randalls to put in issue at trial or in its post-trial brief the factors that are vital to an evaluation of the appropriateness of the work done by Attorneys on behalf of the class, the court did not have occasion to study those factors when making the fee-shifting award decision. Had the issue been drawn at that time, the court is very unlikely to have found from the trial evidence that the attorneys' fees shown by Agreed Exhibit

---

**6.** The opening brief filed by attorneys for the class in the Fifth Circuit does request in the Conclusion section recovery of attorneys' fee and costs. However, the court has not been provided anything to indicate that such a request was presented to the Fifth Circuit after the successful defense of Randalls' cross-appeal.

179 "were necessary to be incurred in the prosecution of plaintiffs' claims against defendant in this action," 145 F.Supp.2d at 778, that all those fees were "reasonable in amount to be charged in this geographical area," *id.*, and that there was "no basis in the evidence for a reduction below the lodestar amounts," *id.*

Now that the court's attention has been focused on the appropriateness of the work done by Attorneys on this case, and the court has had the assistance of the excellent critique of that work Kirkley provided in his response and objection on behalf of the class members to Attorneys' application for common fund recovery, the court has concluded that Attorneys did much more work than was necessary for the prosecution of plaintiffs' claims against Randalls. While the per-hour rates charged by Attorneys are reasonable in amount to be charged in this geographical area for work necessarily done, the charges by Attorneys for much of the work they did on this case become unreasonable in amount considering the nature of work. If Randalls had taken issue in a meaningful way with the appropriateness of the work shown by Agreed Exhibit 179, the court, when fixing the amount of the fee-shifting award, undoubtedly would have found that there was basis in the evidence for a significant reduction below the amounts shown on the exhibit.

The court agrees that Attorneys should receive compensation for the risk of loss they took when they undertook and pursued this litigation on a contingent-fee basis and for the loss they experienced by reason of the delays experienced between the dates of performance of their work and the date of payment. However, the court has concluded that the fee award already paid to the attorneys more than adequately recognizes those factors.

To begin with, there is no proof in the record that the attorneys exercised "billing judgment." *See Walker v. United States Dep't of Housing & Urban Dev.*, 99 F.3d 761, 770 (5th Cir.1996) (saying "[t]he plaintiffs are charged with the burden of showing the reasonableness of the hours they bill and, accordingly, are charged with proving that they exercised billing judgment."). The term "billing judgment . . . refers to the usual practice of law firms in writing off unproductive, excessive, or redundant hours." *Id.* at 769. For reasons given in Kirkley's response to the application, the time records of Gardere Wynne affirmatively show that there was a failure to exercise the requisite judgment. *See* class members' resp. at 15–17. Drawing on the court's own experience in ERISA class action litigation not dissimilar to this litigation, the court finds that too many lawyers and too much lawyer time was devoted to such things as preparation for and attendance at depositions, meetings, hearings (including telephone conferences with the court), and authoring and reviewing pleadings, motions, and other documents.

A troubling aspect of the handling by Attorneys of this litigation is their conduct in arranging for it to proceed with thirty-five named plaintiffs/class representatives, when the original four would have done the job at least as well. Quoting from the opinion of a district court in Pennsylvania, "[t]here surely is no need . . . for thirty-five [class representatives]." *In re U.S. Bioscience Sec. Litig.*, 155 F.R.D. 116, 122 n. 16 (E.D.Pa.1994).

Viewed from the standpoint of the class representatives, information provided to the court indicates that the thirty-five collectively devoted 6,662 hours to this litigation, including 487.75 hours devoted to deposition proceedings, 1,430 hours to group meetings, 1,211 hours to settlement/mediation proceedings, and 642 hours traveling. This provides some measure of the magni-

tude of attorney time the presence of so many class representatives caused to be expended.

The depositions of all thirty-five class representatives were taken by Randalls, and apparently all thirty-five of them attended two court-ordered mediation sessions and several court-ordered settlement sessions. This is not to mention other meetings called by attorneys for the purpose of advising the class representatives. While precise hours cannot be calculated because of the method of timekeeping employed by the attorneys, the court thinks it fair to say that hundreds, if not thousands, of hours of attorney time were consumed in responding to discovery of one kind or another directed to the thirty-five class representatives or .to other special problems created by having too many class representatives. Only a small fraction of that work would have been required if Attorneys had elected to go forward with only the four class representatives they started with.

The numbers of attorneys who participated in discovery and other activities presents another serious problem. For instance, the billing records of Gardere Wynne indicate that two attorneys, more often than not Wright and Elaine Murphy ("Murphy"), were engaged in activities related to the taking by Randalls of the depositions of the class representatives. Wright's time was billed at $325 an hour and Murphy's time at $175. Just as an example, and this seems to be typical, the court is setting forth below some of the entries in the Gardere Wynne time records covering a six-day period in early 1997:

| 02/28/97 | R. Wright | 1.7 | Prepare for depositions of Joe Cutrer and Ed Fortner. |

| 02/28/97 | E. Murphy | 1.2 | Prepare for depositions in Austin; review additional documents produced by the Defendants. |

| 03/01/97 | R. Wright | 4.5 | Prepare for depositions of Joe Cutrer and Ed Fortner. |

. . . .

| 03/02/97 | R. Wright | 7.5 | Prepare for depositions of Joe Cutrer, Ed Fortner and Rick Williams. |

. . . .

| 03/03/97 | R. Wright | 12.5 | Prepare for and attend deposition of Joe Cutrer; Prepare for deposition of Ed Fortner. |

| 03/03/97 | E. Murphy | 10.3 | Attend Mr. Cutrer's deposition; Review notes from Mr. Cutrer's deposition and prepare for Ed Fortner's deposition. |

| 03/04/97 | R. Wright | 12.5 | Prepare for and attend deposition of Ed Fortner; Prepare for deposition of Rick Williams; Return to Dallas. |

| 03/04/97 | E. Murphy | 12.0 | Attend Mr. Fortner's deposition; prepare for Ricky Williams' deposition. |

. . . .

| 03/05/97 | R. Wright | 7.5 | Prepare for and attend deposition of Rick Williams; Prepare for deposition of Tom McCarthy. |

03/05/97 E. Murphy 10.0 Attend deposition of Mr. Williams; review Tom McCarthy's documents to be produced; dictate letter to George Bramblett regarding production of Mr. McCarthy's first set of documents; edit letter; dictate letter to Mr. Bramblett regarding confirmation of request to supplement interrogatories responses; edit letter; dictate letter to clients regarding production of documents; edit letter; review sample notice of intention to take deposition duces tecum from the Defendants; prepare for Mr. McCarthy's deposition; phone conference with Mr. Bramblett regarding production of McCarthy documents.

App. to Application, tab 3 (Agreed Ex. 179). Each of the persons named in this segment of the work itemization is a class representative. In that six-day time span, almost $21,000 of lawyer time was devoted to participation by Gardere Wynne attorneys in matters pertaining to depositions of only four class representatives. Wright and Murphy each prepared for the depositions and each was present when they were taken.

And, the foregoing is only the beginning of the time devoted by the attorneys to those depositions. Later entries show that the transcripts of the depositions were reviewed and summarized, tasks that consumed significant numbers of hours. All of this is in addition to the time that undoubtedly was devoted to arranging for the depositions to be taken.

Another set of entries in the time records illustrating the extravagant expenditure of time by the Gardere Wynne attorneys in connection with the taking of the deposition of a class representative are the following entries pertaining to Mr. Mansfield's deposition, which was taken in Charlotte, North Carolina:

06/06/97 E. Murphy 0.6 Draft and edit First Amended Deposition Notice of Judy Ward and Deposition Notice of Jack Evans, Jr.; prepare for Bill Mansfield's deposition.

06/07/97 R. Wright 7.5 Review file materials; Travel to Raleigh for deposition of Bill Mansfield.

06/08/97 R. Wright 6.3 Prepare for deposition of Bill Mansfield; Review file materials.

06/08/97 E. Murphy 1.0 Prepare for deposition of Bill Mansfield.

06/09/97 R. Wright 10.5 Prepare for and attend deposition of Bill Mansfield; Return to Dallas.

06/09/97 E. Murphy 14.0 Prepare for and defend Bill Mansfield's deposition; return to Dallas.

*Id.* Thus, the Gardere Wynne attorneys expended about $10,500 in attorney time for participating in the taking of this one deposition of a class representative. This is not to mention the post-deposition cost (transcript review and summarization), nor does it take into account the time devoted to pre-deposition activities (such as receipt and review of deposition notice, working on accumulation of documents pursuant to deposition subpoena duces tecum, communications with the client relative to the deposition, and other time devoted before June 6, 1997, to preparation for the deposi-

tion—an entry on June 5, 1997, shows Wright having devoted 6.7 hours to deposition matters, including preparation for the deposition of Bill Mansfield.)

Exhaustive preparation might be expected in anticipation of the taking of a deposition of an opponent witness, one not anxious to cooperate. Or, if the intent was to develop information through the class representatives by means of cross-examination after conclusion of the questioning by the attorney for Randalls, hours of preparation would not be unexpected. Apparently that was not happening in the taking of the depositions of the thirty-five class representatives. The court has reviewed the four specimen transcripts provided by Attorneys of depositions of class representatives, including the $10,500 deposition of Mr. Mansfield (which was 77 pages in length), and finds that in no instance was a single question posed to the witness by either of the attorneys in attendance from Gardere Wynne. The typical comment by a Gardere Wynne attorney at the conclusion of the questioning by the attorney for Randalls was "[w]e'll reserve our questions until the time of trial." Mansfield Dep. at 77.

Another deposition transcript furnished to the court for review was the March 11, 1997, deposition of class representative Carrabba. The time records show that on March 11, 1997, Wright and Murphy both prepared for and attended the taking of that deposition. Murphy devoted 10.7 hours, or $1,872.50 worth of time, to that endeavor, and Wright devoted 12.5 hours, or $4,062.50 (along with miscellaneous other deposition endeavors). Even in those exceptional instances when only one Gardere Wynne attorney prepared for and attended a class representative deposition, the deposition taking was expensive. Greg Smith's deposition transcript is another specimen reviewed by the court. Murphy went alone to San Antonio to sit in on that deposition. She devoted 10.5 hours on

June 16, 1997, to "[t]ravel to San Antonio for Greg Smith's deposition; prepare to defend Mr. Smith's deposition; conference with Mr. Smith," App. to the Application, tab 3 (Agreed Ex. 179). The fourth transcript reviewed by the court was of the deposition of class representative Chessmore, which was taken July 29, 1997. Wright chose to sit in on that deposition himself, at his $325 per-hour rate, adding another $4,160 to the fee bill.

The court cannot see that the class gained anything significant from all this discovery directed to the class representatives. While Gardere Wynne could not prevent the discovery once it caused thirty-five persons to be named as class representatives, it certainly could have exercised good judgment in not expanding the class representatives to that large number. Nor was there any need for the Gardere Wynne attorneys to devote so much manpower and time to depositions being taken by their opponent under circumstances that did not require the Gardere Wynne attorneys to be prepared to ask questions during the deposition taking.

The court has devoted as much time as it has to the matter of the taking of the depositions of the class representatives because it provides the most readily demonstrable evidence of the inappropriate expenditure of time by Gardere Wynne attorneys by reason of their decision to cause there to be so many class representatives (as well as demonstrating generally the extravagant expenditure of attorney time and resources).

The court is conscious of the circumstances that the ongoing joinder of additional class representatives by amended complaints was done with leave of court, and that the class certification orders designated all thirty-five named plaintiffs as class representatives. Those actions were taken at the request of Attorneys and with

no opposition from Randalls based on the number of named plaintiffs. Perhaps it is appropriate that Randalls, having made no objection to the joinder and certification of so many class representatives, or to the excessive time devoted to the handling of the litigation by Gardere Wynne attorneys, was required by the fee-shifting award to bear all of the fee charges shown on Agreed Exhibit 179. However, the court is not inclined to cause the class members to bear any additional fee award growing out of the work for which those charges were made. If the court were to do so, the court would have failed in its obligation to the class. There is no principle of the common fund doctrine that would support an additional award to Attorneys. They already have been more than adequately compensated for the work they did in creating the common fund and whatever risks they took.

## VII.

*The Court is Ordering Payment Out of the Fund of All or Part of Certain Expense Items, and Denying Payment of Others*

■ The categories of expenses included in the request of Attorneys to be reimbursed for expenses in the total amount of $462,162.31 are itemized under tab 6 of the appendix to the application by category and total dollar amount for each category as follows:

| | |
|---|---|
| Experts/Consultants | $ 314,046.77 |
| Outside Copy Charges | 39,845.31 |
| Internal Copying Costs | 15,794.30 |
| Legal Research | 32,970.15 |
| Contract Labor | 1,787.91 |
| Courier Fees | 11,672.45 |
| Mediation Fees | 6,904.75 |
| Postage | 1,946.67 |
| Credit Card Calls | 1,943.06 |
| Long Distance | 686.94 |
| Fax/Telecopy | 719.76 |
| Business Meetings | 7,294.20 |
| Mileage/Parking/Cab Fares | 5,181.05 |
| Airfare/Hotel/Other Travel Expenses | 21,368.99 |
| TOTAL: | $ 462,162.31 |

The court has concluded that Attorneys should be reimbursed from the Fund for all or part of some of these expense items,

and that their request for reimbursement should be denied as to others. In making its evaluation as to which of these expenses, and how much of each, to award, the court has taken into account that "counsel have a duty to the class to do things in an economical, cost-efficient fashion." *See Spicer v. Chicago Bd. Options Exch., Inc.,* 844 F.Supp. 1226, 1262 (N.D.Ill.1993).

Because all of the expenses were incurred by the Gardere Wynne firm, in those instances where reimbursement from the fund is ordered the reimbursement will be made by payment to Wright and Whitehill.

### A. *Experts/Consultants.*

Provided with the application relative to the $314,046.77 "Experts/Consultants" category is a one-page compilation under tab A of tab 6 of the appendix, which gives the court little information. At the court's request, Attorneys have now provided copies of the opinions rendered by the Experts/Consultants other than Rogers & Associates and Bowers & Cain (Bowers & Stevenson).

#### 1. *Rogers & Associates.*

■ The reimbursement sought for Rogers & Associates pertains to $120,387.50 charged by that firm for time and expenses its principal, Dale Craig Rogers ("Rogers"), incurred in working with Attorneys in trial preparation and as a trial witness. Rogers has expertise working with ERISA plans, and he and his firm have a large pension consultants and administration firm in Fort Worth. He is a certified pension consultant, and a member of the American Society of Pension Actuaries and Consultants. Rogers was the only expert who testified for plaintiffs at trial on the ERISA issues in this case. While the court thought some of the opin-

ions expressed by Rogers were rather far-fetched, the court accepted some of his testimony, and considers that his testimony, for the most part, was within the realm of acceptable expert testimony to be offered on behalf of the plaintiffs. The court is ordering that Wright and Whitehill be paid $120,387.50 out of the Fund to reimburse them for payments to Rogers & Associates.

### 2. *Bowers & Cain (Bowers & Stevenson).*

█ The charges of $5,625.00 by this firm are for the services Bill Bowers ("Bowers"), a highly qualified attorney, devoted to preparation for the giving of expert testimony, and to the giving of testimony, on the issue of the amount the court should award as attorneys' fees under the fee-shifting provision of ERISA. That the class should bear these expenses is appropriate because if Attorneys had not been successful in their request for a significant fee-shifting award there might well have been a payment out of the common fund of a rather significant amount as attorneys' fees. Bowers contributed to that success. The court is ordering $5,625.00 paid to Wright and Whitehill out of the Fund as reimbursement for these expenses.

### 3. *The Perryman Group.*

█ The court is not ordering reimbursement of any part of the $96,671.49 incurred by Attorneys through The Perryman Group. M. Ray Perryman ("Perryman") apparently is the principal of this group, and the charges of the group appear to relate to his work and work employees or members of the group did under his supervision to assist him in formulating opinions he was asked to, and did, provide to Attorneys. In his deposition he said that he was asked to address three issues: first, whether it was appropriate to use an earnings-based or an inflation-based discount rate in the present value calculations of withheld retirement benefits; second, if such a discount rate should be used, what would be the appropriate level of that rate; and, third, whether Randalls profited from the termination of the pension plan, and, if so, the dollar amount of that profit. Perryman rendered an opinion that 2.4% was an appropriate discount rate, that there was a profit to the employer from termination of the pension plan, and that the profit escalated to around $90,000,000 in equity value with the merger of Randalls with Safeway, Inc., in 1999.

Attorneys chose not to rely on Perryman, but instead to rely on Rogers, on the issue of the appropriate discount rate to use. No evidence was received at trial on the issue of economic benefits realized by the employer from the savings achieved by the employer through the termination of the pension plan. In the end, the work done by The Perryman Group did not benefit the class in any respect. While attorneys for the class are to be commended for intellectual curiosity, and for exploring avenues of relief, the court finds that they went much too far when they incurred these charges with The Perryman Group. The court is denying the request for reimbursement from the Fund for these charges.

### 4. *Smith, Jackson, Cooper & Daniel (James Smith & Co.).*

█ Apparently these charges in the total amount of $17,691.80 were incurred through this organization for work done by and under the supervision of one of its principals, James A. Smith ("Smith"). Smith is a certificated public accountant who performed certain calculations and prepared a number of charts based on those calculations. The indication is that none of those calculations were used, or relied upon, by Rogers, plaintiffs' ERISA

expert at trial. The court can discern no benefit gained by the class from work done by this organization or Smith. Therefore, the court is denying reimbursement from the Fund for these expenses.

### 5. *Robert M. Herman, P.C.*

 The total of $51,783.43 in expenses presented under this name represents legal services rendered by a Dallas attorney by the name of Robert M. Herman ("Herman"). Herman provided his services at the rate of $250.00 an hour. Apparently he has as one of his specialties representing persons who have ERISA legal issues to resolve. His itemized time records, which were provided to the court by Kirkley as part of the response of the class members to Attorneys' application, show that he became employed in this case, apparently through Wright, in late May 1997, and continued to devote time to the case through March 10, 1999. He spent time conferring with Wright, reviewing documents provided by Wright, conferring with Whitehill, meeting with Attorneys at the offices of Gardere Wynne regarding issues of the lawsuit, conferring with Murphy, and preparing to serve as an expert witness on ERISA issues. He met with Wright regarding expert testimony given by Randalls' experts, and researched issues regarding expert testimony. He assisted attorneys with Gardere Wynne in preparing for the deposition of a lawyer Randalls proposed to use as a trial expert. He did legal research on issues related to the case, and had conferences with representatives of the Department of Labor relative to issues in the case.

The court's reaction to Herman's involvement in this case is that he basically was another attorney providing representation to the plaintiffs in the case. While he did not make court appearances, he was working behind the scenes as an attorney representing the plaintiff just as twenty-some-odd attorneys with Gardere Wynne were working on the case behind the scenes. The fee charges of the latter were included in the fee-shifting award against Randalls. Had Herman's fees and expenses been treated the same as the other attorneys employed to provide legal services to the class, they might well have been recognized in whole or in part in the fee-shifting award. But, the court is not going to have the class bear any part of Herman's fee charges through reimbursement from the Fund.

Even if a significant, or even the major, part of Herman's time had been devoted to preparation to give expert testimony at the trial of this case, the court would not allow reimbursement from the Fund. Attorneys should have known that the court would not allow at trial the testimony of a witness concerning the law applicable to the case. As the court has made known on numerous occasions to counsel in various cases, the court does not need lectures from the witness stand on the law. If a party has an attorney with special legal expertise the party wishes to convey to the court through the attorney, the appropriate procedure is for the attorney to become associated as an attorney in the case and to make his presentation to the court from behind the podium in the form of an argument on the law.

### B. *Copy Charges and Costs.*

 Attorneys seek reimbursement for $55,639.61 for copy charges and costs— $39,845.31 for outside copy charges and $15,794.30 for inside copy costs. The itemization of the outside copy charges shows charges for copying services rendered from December 12, 1996, through February 16, 2000. The itemization, as it is, of the inside copy costs shows copies having been made from June 25, 1996, through March 20, 2000. Because of the volume of paperwork generated by this litigation, the

court would expect a very large expenditure for copying documents. However, the court thinks it fair to assume that a significant part of the copying costs was generated because of the excessive number of class representatives. Taking that into account, the court is estimating that $15,000.00 of the copy charges and copying costs would not have been incurred if there had only been four class representatives. Therefore, the court is ordering reimbursement to Wright and Whitehill from the Fund of $40,639.61 for copy charges and copying costs.

C. *Computerized Research.*

▉▉▉ Attorneys are seeking recovery from the Fund of $32,970.15 as charges they incurred in conducting computerized research. The court subscribes to the reasoning of another district court on this subject:

> The Court is well aware that it is a somewhat prevalent practice, where the client will permit it, for lawyers to seek reimbursement of the time charges made by WESTLAW for research facilities. The Court, however, is satisfied that this is properly an item attributed to firm overhead. The Court assumes that the actual time of a lawyer utilizing the research computer facility is, in fact, booked at his normal hourly rate. The Court thinks it inappropriate and unreasonable to permit an overhead item of this type to be recovered in addition to recovery for the time of the lawyer who used the research facility.

*Auburn Police Union v. Tierney,* 762 F.Supp. 3, 5 (D.Me.1991). No reimbursement is being allowed for this expense.

D. *Contract Labor and Courier Fees.*

The court has no reason to think that these items ($1,787.91 for contract labor and $11,672.45 for courier fees) are not legitimate expenses for which Attorneys should receive reimbursement. The court is ordering reimbursement to Wright and Whitehill of a total of $13,460.36 for these items of expense.

E. *Mediation Fees.*

Attorneys seek reimbursement for $6,904.75 as fees paid to mediators in connection with the two court-ordered mediations in this case. The court is ordering reimbursement from the Fund in that amount.

F. *Postage.*

▉▉▉ Normally the court considers postage to be overhead cost that would be included in the fee charges. However, because of the need for notice mailings to the entire class on at least two occasions, the court has concluded that Attorneys should be reimbursed from the Fund for part of this postage. The court is ordering reimbursement of $600.00, which the court estimates is sufficient to cover the postage that would be involved in mailing notices to the class members. The remainder of the postage amount is being denied.

G. *Credit Card Calls and Long Distance.*

A total of $2,630.00 is claimed for these items. The justification given by Wright in his affidavit for these expenses is the need to maintain communication with class representatives, class members, counsel, and the court. While there is a risk that some of these charges would not have been incurred if there had been fewer class representatives, the court is going to assume that these charges are all appropriate for payment from the Fund. The court is ordering reimbursement to Wright and Whitehill of $2,630.00 from the Fund for payment of these expenses.

H. *Fax/Telecopy.*

The court has no reason to question the legitimacy of this $719.76 expense item,

which, according to Wright's affidavit, was generated primarily in connection with faxing materials to opposing counsel. The court is ordering reimbursement to Wright and Whitehill from the Fund of this amount.

I. *Business Meetings; Mileage/Parking/Cab Fares; Airfare/Hotel/Other Travel Expenses.*

 For these items, Attorneys seek reimbursement from the Fund of $33,844.24 ($7,294.20 for business meetings, $5,181.05 for mileage/parking/cab fares, and $21,368.99 for airfare/hotel/other travel expenses). The court has no doubt that a significant part of these expenses were incurred legitimately. However, the court likewise is persuaded that a significant part of the expenses were inappropriately incurred because of lawyers, often too many, traveling to be present while the thirty-five class representatives' depositions were being taken, and in the providing of meals to, and travel for, too many class representatives—ones that never should have been designated by Attorneys as class representatives in the first place. The court believes that a fair estimate of the part of these expenses that should be allowed for reimbursement is 50% of the total. The court is ordering Wright and Whitehill reimbursed from the Fund for $16,922.12 as to these expenses.

\* \* \* \* \* \*

Consistent with the decisions expressed in this section VII, the court is ordering payment from the Fund to Wright and Whitehill of a total of $207,889.10 as expense reimbursement.

## VIII.

*The Request in the Application that Bonuses in the Total Amount of $525,000 Be Paid to the Class Representatives*

While the court reserved in the April 26, 2000, revision of and supplementation to the April 11, 2000, memorandum opinion and order future consideration of "any claim counsel for the Class wish to make by motion for recovery from the Class of an additional amount as attorneys' fees," 4/26/00 supplementation at 3, the court said nothing about reserving for future consideration any claim for payment to the class representatives out of the common fund of any amount as a reward or bonus, by way of expense reimbursement, or otherwise. When Attorneys filed their original application for common fund recovery in May 2000, they raised for the first time the possibility of payments to the class representatives from the common fund— suggesting at that time a total of $250,000, to be allocated per capita among the representatives. Apparently copies of the original application were not provided by Attorneys to the class members. Understandably, the class members are disappointed at this time to learn that another call is being made on their recovery against Randalls.

 Incentive awards for class representatives have been approved, and the court has no doubt that it has discretion to make awards of that kind in this case, but the court is mindful that the "practice of approving incentive awards has recently attracted what seems . . . to be trenchant and persuasive criticism." *In re Bioscience Sec. Litig.*, 155 F.R.D. at 121. Moreover, the granting of such an award goes contrary to the teachings of the court decisions that have defined the reasons for allowing payment from a common fund. *See supra* at 822–23. Therefore, the court should not make such an award absent compelling reasons.

 As the court previously has discussed, there was no need for the joinder of thirty-five class representatives in this action. Mention has been made of limitations concerns as to the claims of the class

representatives against Randalls, but, that was not a legitimate reason for naming so many persons to serve as class representatives. *See Crown Cork & Seal Co. v. Parker,* 462 U.S. 345, 353, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 715 n. 25 (5th Cir.1994). Apparently the thirty-five became named plaintiffs so they would be in a posture to pursue individual claims in the event class certification were to be denied. The other members of the class did not enjoy that posture. And, the court has seen indication that a certain amount of attorney time was devoted to development of individual claims on behalf of the class members. In those respects, the class representatives had the potential to gain an advantage over the other class members if class certification had been denied.

Information provided by the class representatives indicates that all but one of them paid a $250 cost deposit to Attorneys. The court has not been informed of the expectations of the class representatives vis-a-vis Attorneys in the event they are not reimbursed from the Fund for that deposit and their other expenses. If there are any expectations of reimbursement from Attorneys, that is a matter in which the court has not been asked to be involved.

As to the other expenses claimed by the class members, there is a considerable range. Six of them say they lost wages, ranging from $910 to $5,200. Yet, there is no doubt that many of the other class members devoted time just as valuable to them as was the time for which the six are claiming significant reimbursement under the heading lost wages/salary. The totals of the expenses claimed by the class representatives range from $250 to $6,770. The court has no way of measuring the reasonableness or necessity of the individual expense items included in the totals. Payments made out of the Fund on the basis of guesswork would not be appropriate.

For the reasons given above, the court is not ordering any payment to be made from the Fund to the class representatives.

## IX.

## ORDER

For the reasons given above,

The court ORDERS that the Clerk pay $207,889.10 out of the Fund to Wright and Whitehill as expense reimbursement.

The court further ORDERS that Attorneys' application be, and is hereby, denied in all other respects.

The court further ORDERS that the balance remaining in the Fund, after payment to Wright and Whitehill of the $207,889.10, mentioned above and after deduction of registry fees, be disbursed in its entirety to the class members named in Exhibit A to the April 26, 2000, Revision of and Supplementation to April 11, 2000, Memorandum Opinion and Order and in the respective percentages shown in the "Percentage" column of that exhibit.

The court further ORDERS that the Clerk deliver the disbursement checks to the class members to Wright and Whitehill, who are ORDERED to promptly mail them to the class members.

The court further ORDERS that Attorneys promptly mail a copy of this memorandum opinion and order to the class members.